**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. _____

A.V., a child, through his mother and next friend, MICHELLE HANSON;

      Plaintiff,

v.

DOUGLAS COUNTY SCHOOL DISTRICT RE-1;
TONY SPURLOCK, the Douglas County Sheriff, in his official capacity;
SIDNEY NICHOLSON, a Douglas County School Resource Officer, in his individual capacity;
LYLE PETERSON, a Douglas County School Resource Officer, in his individual capacity;
DANIEL COYLE, a Douglas County School Resource Officer, in his individual capacity,

      Defendants.

---

### COMPLAINT AND JURY DEMAND

---

Plaintiff A.V., a child, through his mother and next friend, Michelle Hanson, by and through counsel, Jack Robinson of SPIES, POWERS & ROBINSON, P.C., and Mark Silverstein, Sara R. Neel, and Arielle Herzberg of the AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF COLORADO, respectfully alleges for his Complaint and Jury Demand as follows:

### <u>INTRODUCTION</u>

1.     On August 29, 2019, officers in police uniforms entered Sagewood Middle School and aggressively handcuffed A.V., an eleven-year-old child with autism.  They dragged the handcuffed child through the hallways of his school, placed him in a patrol car, and left him there for hours, while, still handcuffed, he banged his head repeatedly against the plexiglass of the patrol car and cried in pain.

1

2.      That morning, A.V. had faced disability-related challenges when a classmate wrote on him with markers.  A.V. is sensitive to touch.  He became escalated and poked his classmate with a pencil.  A.V. was calming down with the help of the school psychologist when the officers arrested him.

3.      A.V.'s stepfather rushed to the school and asked to see A.V., but the officers would not allow him to see A.V.  A.V's stepfather asked the officers to take A.V. to get medical attention, but they refused.

4.      Instead, after A.V. was left handcuffed and banging his head for hours, an officer drove A.V. to a juvenile detention center and placed A.V. in custody on charges of assault, harassment, and resisting arrest.  A.V. remained in custody until his parents were able to post a $25,000 bond.  The charges against him have since been dropped.

5.      A.V. has suffered physically and emotionally as a result of the Defendants' violations of his rights.

6.      The officers involved in this traumatic handcuffing and arrest of A.V. were School Resource Officers ("SROs").  They are Douglas County Sheriff's deputies who are jointly employed by the Douglas County School District.  They had been specifically assigned to middle schools for the first time that year without adequate training on interacting with students with disabilities.

7.      No SRO was disciplined due to the incident, and in fact, one of the SROs, SRO Nicholson, was commended for his handling of the situation.  He was deemed to have completed the SRO field training program and recommended to be moved to solo status just a few days after the incident.  Only a few months after handcuffing A.V, SRO Nicholson repeated his

behavior: he handcuffed a twelve-year-old child with disabilities after that child became escalated.  As with A.V., he left that child handcuffed for hours.

## JURISDICTION AND VENUE

8.      This action arises under the Constitution and laws of the United States, pursuant to 42 U.S.C. § 1983; the Americans with Disabilities Act, 42 U.S.C. § 12131; and the Rehabilitation Act, 29 U.S.C. § 794.  This Court has jurisdiction pursuant to 28 U.S.C. § 1331.

9.      Venue is proper pursuant to 28 U.S.C. § 1391.  All parties reside within the District of Colorado, and the events described in this Complaint occurred in the District of Colorado.

## PARTIES

10.      Plaintiff A.V. is a minor child who, at the time of the incident, was an eleven-year-old student at Sagewood Middle School, a public school in the Douglas County School District.  Michelle Hanson is the mother of A.V.  Plaintiff A.V. and his mother and next friend, Michelle Hanson, are residents of Douglas County, Colorado.

11.      Defendant Douglas County School District RE-1 ("School District") is a political subdivision of the state of Colorado.

12.      At all times relevant to this Complaint, Defendant Tony Spurlock was the Douglas County Sheriff ("Sheriff").  He had final policymaking authority for the Douglas County Sheriff's Office ("Sheriff's Office" or "DCSO").  The Sheriff is the official responsible for ensuring that the Sheriff's Office and its employees comply with the Constitution, as well as federal and state law.  He is sued in his official capacity.

13.      At all times relevant to this Complaint, Defendant Sidney Nicholson, also known as Chance Nicholson ("SRO Nicholson" or "Nicholson"), Defendant Lyle Peterson ("SRO

Peterson" or "Peterson"), and Defendant Daniel Coyle ("SRO Coyle" or "Coyle") (collectively, "Defendant SROs") were SROs.  They are Douglas County Sheriff's deputies who are jointly employed by the Douglas County School District.  Each SRO is sued in his individual capacity.

14.    At all times relevant to this Complaint, Defendants were acting or failing to act under color of state law.

### FACTUAL ALLEGATIONS

15.    At the time of the incident described in this Complaint, A.V. was an eleven-year-old boy and a sixth-grade student at Sagewood Middle School.

16.    A.V. is a beloved son, fun brother, protective friend, and enthusiastic student.

17.    He is caring and has a great sense of humor and he loves video games, electronics, cat videos, and his family.

18.    At the time of the incident, A.V. had also been diagnosed with Autism Spectrum Disorder ("autism") and a serious emotional disability.

19.    A.V.'s disabilities cause him to avoid some sensory stimuli and to be triggered by touch and loud sounds.  A.V.'s disability also cause him to have difficulty managing his response to frustration, expressing emotions, wants, and needs, and handling some transitions.

20.    A.V. is an individual with disabilities within the meaning of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794(a), and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*

21.    In a recent school year, 11.9% of enrolled students in Sagewood Middle School, and 13.1% of students in the Douglas County School District more generally, have been students with disabilities.[1]

22.    A.V. is Hispanic.  In a recent school year, the student body of Sagewood Middle School has been composed of a large majority of white students, with Hispanic students comprising 11.9% of the school.[2]

### The Argument Between A.V. and his Classmate

23.    On August 29, 2019, in the third week of the 2019-2020 school year, A.V. was in an elective class called Family and Consumer Services when he experienced disability-related behavioral challenges.

24.    These challenges manifested when A.V.'s classmate named Daimian wrote on A.V. with a marker, triggering A.V. to become escalated.

25.    A.V. responded by poking Daimian with a pencil, causing Daimian to have small cut on his arm.   A picture of Daimian's cut is copied here.



---

[1] Civil Rights Data Collection, *Sagewood Middle School*, https://ocrdata.ed.gov/profile/9/school/225790/summary; Civil Rights Data Collection, *Douglas County School District*, https://ocrdata.ed.gov/profile/9/district/27848/summary.
[2] Civil Rights Data Collection, *Sagewood Middle School*, https://ocrdata.ed.gov/profile/9/school/225790/summary.

26.     Daimian said that the cut did not hurt.

27.     Shortly after this happened, a classroom aide texted school administrators that she needed help with A.V.

28.     In response, the Dean of Students and the Principal—Dr. Christine Funk and Ben D'Ardenne—reported to the classroom.

29.     Dr. Funk and Principal D'Ardenne requested that A.V. leave the classroom.  A.V. complied.

30.     Dr. Funk and Principal D'Ardenne alleged that A.V. pushed past them as he was leaving.  No school staff reported that any physical contact hurt.

### A.V. Calms Down with the Help of the School Psychologist

31.     After A.V. left the classroom, A.V. sat down in the Mountain Lion Pod—an open area of the school between classrooms.

32.     Dr. Smrcka, the school psychologist, came to the pod after a few minutes.

33.     A.V. de-escalated while listening to special sensory music through his headphones, and he sat quietly with Dr. Smrcka.

### SRO Nicholson and Peterson Arrive

34.     After A.V. left the classroom, Principal D'Ardenne texted the SRO assigned to Sagewood Middle School, SRO Nicholson, about the argument between A.V. and his classmate.

35.     Soon after, as A.V. was sitting calmly with the school psychologist, SRO Nicholson, along with SRO Peterson, arrived at Sagewood Middle School in response to Principal D'Ardenne's text.

36.     Principal D'Ardenne greeted Nicholson and Peterson and explained that Daimian asked A.V. to stop doing something in class, and A.V. responded by "stabbing" Daimian with a pencil.

37.     Principal D'Ardenne told Nicholson and Peterson that the school had called A.V.'s parents.

38.     He also told the SROs that A.V. had serious emotional disabilities.  He further explained that A.V. was currently in the Mountain Lion Pod with Dr. Smrcka, the school psychologist, and that A.V. had calmed down.

39.     Principal D'Ardenne said that he was worried that A.V. may become re-escalated, so he suggested that he try to move A.V. first before the SROs got involved.

40.     SRO Nicholson responded by instead proposing that he ask A.V. to come talk to him in the SRO office and said: "if he wants to come, that's fine; if he doesn't, that's fine too." Principal D'Ardenne agreed to that plan.

**SRO Nicholson and Peterson Aggressively Handcuff A.V.**

41.     SROs Nicholson and Peterson headed to the Mountain Lion Pod, where A.V. was sitting calmly with Dr. Smrcka.

42.     Nicholson asked A.V. to come talk in his office in the school.  A.V. shook his head no.

43.     Dr. Smrcka explained to the officers that A.V. was not highly verbal and that he tends not to talk, but sometimes nods his head yes or no.

44.     Nicholson continued to ask A.V. if he would come talk in the SRO office.  A.V. stared blankly and occasionally shook his head no in response.

45.     Then, despite the fact that A.V. was sitting quietly and that there was no emergency requiring immediate intervention, SRO Nicholson and Peterson abruptly approached A.V. in a threatening manner and aggressively handcuffed him.

46.     Nicholson did not adhere to his original suggestion that he would ask A.V. to come with him to the SRO office, and "if he wants to come, that's fine; if he doesn't, that's fine too."  SRO Nicholson and Peterson did not consider any alternatives, such as asking A.V.'s psychologist or classroom aide to bring A.V. to the SROs' office or asking for A.V.'s parents to come to school and bring A.V. to their office.

47.     Instead, demonstrating their lack of training regarding A.V.'s disability, Nicholson and Peterson approached A.V. in a threatening manner that would surely cause A.V. to become re-escalated.

48.     In order to get A.V. in handcuffs, Nicholson took hold of A.V.'s right arm and Peterson took A.V.'s left arm above the elbow.   A.V. tried to lean back and pull away, and cried: "Stop, you're hurting me!"  A.V. screamed "ow" and cried.  A.V. kicked the bottom of a table and wiggled his arms around, asking for them to stop.

49.     As Nicholson and Peterson continued to try to handcuff him, A.V. banged his head against the concrete wall of the school.

50.     A.V. also yelled "Stop!" and "Ow!"

51.     SRO Nicholson grabbed A.V.'s head at the nape of his neck and held it tightly. A.V. yelled: "Ow!  You're choking me!  Ow!"

52.     Once Nicholson and Peterson got A.V. in handcuffs, they paraded the handcuffed eleven-year-old through the hallways of the school, as A.V. pushed back against them, crying.

53.     The SROs erroneously interpreted A.V.'s reactions as "resisting" and being

"violent."  When SRO Peterson told A.V. that he needed to stop resisting, A.V. said: "I'm not!"

54.     The SROs pushed the handcuffed boy out of the building toward the patrol car.

55.     A.V. asked officers to remove the handcuffs.  Peterson responded: "We're not

taking them off." A.V. continued to cry as the officers pushed him into their patrol car.

56.     Once he was seated in the patrol car, A.V. began banging his head loudly against

the plexiglass.

**SROs Leave A.V. In the Patrol Car For Hours**

57.     Once A.V. was handcuffed in the backseat of the car, SRO Nicholson left the car,

while SRO Peterson stayed with A.V. in the patrol car.

58.     Nicholson spoke with Principal D'Ardenne.  Nicholson said to Principal

D'Ardenne:  "I was hoping that would go a little easier."  Principal D'Ardenne replied, "Yeah

me too. Well, initially . . . he was in a pretty calm place so I was bummed it went that way."

59.     Principal D'Ardenne also told Nicholson that A.V. had a history of harming

himself.  The principal stated: "[H]e's a kid who's got an emotional disability, which is

obviously why he's responding the way he is.  And he's got this history of self-harm . . .  I just

want to make sure we're doing everything we can to make sure he's not in any position to harm

himself 'cause I think he will try."

60.     At this point, A.V. was banging his head repeatedly on the plexiglass and window

of the patrol car.  Both SROs Peterson and Nicholson saw and heard A.V. banging his head

forcefully while sitting handcuffed in the patrol car.

61.     Yet, rather than move A.V. so that he would not bang his head, Nicholson and Peterson left A.V. banging his head in the car and ignored the principal's warning about A.V. inflicting self-harm in the past.

62.     Nicholson went to collect witness statements, while Peterson stayed near the patrol car by A.V.  A.V. sat handcuffed in the police car for more than two hours.

63.     A.V. calmed down significantly after about 25 minutes in the car.

64.     None of the Defendant SROs removed A.V.'s handcuffs while he sat in the car.

65.     SRO Daniel Coyle—an SRO assigned to another school—arrived at Sagewood at some point while A.V. was still sitting handcuffed in the patrol car.  Like Nicholson and Peterson, Coyle did not uncuff A.V. or do anything to stop A.V. from banging his head.

### A.V.'s Stepfather Comes to School

66.     While A.V. was sitting handcuffed in the car, A.V.'s stepfather arrived at the school.

67.     A.V.'s stepfather asked to see A.V., but SROs would not allow him to.

68.     Nicholson told A.V.'s stepfather that A.V. would be taken to a juvenile detention center, the Marvin W. Foote Youth Services Center.  He told A.V.'s stepfather that A.V. was being charged with assault for allegedly stabbing a student with a pencil and assaulting a police officer.  He also said that A.V. could be charged with harassing the principal and another teacher, but that the school staff did not want to press charges.

69.     A.V.'s stepfather replied: "I mean this is crazy. This is a kid with autism and you guys are gonna press charges against him?"  A.V.'s stepfather explained that "[t]his is a kid with autism that's obviously dysregulated."

70.     A.V.'s stepfather requested that A.V. be taken to Children's Hospital because he had become dysregulated.

71.     Despite A.V.'s stepfather's requests to see A.V. and for the officers to bring A.V. to Children's Hospital, the SROs did not change course or get A.V. medical attention.

### Transporting A.V. to the Juvenile Detention Center

72.     After leaving A.V. handcuffed in the car for over two hours without a parent, without an opportunity to use the restroom and without food, SROs patted A.V. down and moved him into a different police car.  A.V. complied.

73.     SRO Coyle drove A.V. to the Foote Center.

74.     Coyle left A.V. in handcuffs throughout the ride, even though A.V. significantly calmed down.

75.     Although the SROs knew A.V. had been repeatedly and forcefully banging his head against the plexiglass and that he was dysregulated, none of them got A.V. any medical attention.

76.     Nobody at the Foote Center evaluated A.V.'s medical condition.

77.     The SROs discriminated against A.V. because of his disabilities when they determined not to get him medical attention.

78.     The eleven-year-old remained in custody at the Foote Center into the night, until his parents were able to post a $25,000 bond to release him.

79.     A.V. was charged with misdemeanor assault for allegedly causing injury to his classmate, two charges of misdemeanor harassment for allegedly striking school staff, as well as second degree felony assault of a peace officer and a misdemeanor of resisting arrest.  The charges have since been dropped.

**Aftermath**

80.     A.V.'s parents took A.V. to his pediatrician the next morning.

81.     He had a headache and a 5 centimeter hematoma on his forehead from banging his head throughout the incident.

82.     A.V. also had swollen wrists from the handcuffs.

83.     After the incident, A.V. participated in the Day Treatment program at Children's Hospital from September 6 through September 18, 2019.

84.     A.V. has suffered emotionally and since the incident, he demonstrates fear, distrust, and anxiety when interacting with law enforcement officers.

**The Sheriff and School District Failed to Adequately Train the SROs on Interacting with Students with Disabilities**

85.     Both the Douglas County School District and the Douglas County Sheriff were responsible for effectively training the Defendant SROs but failed to do so.

86.     Both were responsible because for the 2019-2020 school year, DCSO and the School District split the costs of the SRO's salaries and benefits, and both DCSO and the School District paid for costs of SRO training.  The SROs were also agents of both the Sheriff's Office and the School District.

87.     The Sheriff's policies state that all officers are trained in recognizing mental health and related disorders, including autism, and trained in de-escalation techniques.  But in reality, SROs receive little or no training on interacting with students with disabilities, how to approach such students, how to de-escalate such students, how to keep these students safe, or when to seek medical attention for such students.

88.     Whatever training they do receive is ineffective and inadequate, and leaves officers with clear gaps in their knowledge of how to interact with students with disabilities.

89.     Additionally, the 2019-2020 school year was the first year that SROs were assigned specifically to Douglas County middle schools, and despite this, neither the School District nor the DCSO provided training to SROs in interacting with middle-school aged children with disabilities.

90.     The SROs involved in this incident did not have appropriate training.

91.     Nicholson had never been an SRO before the 2019-2020 school year.  DCSO and the School District did not assign experienced SROs to middle schools, but instead, at least at Sagewood Middle School, they placed a new SRO: SRO Nicholson.

92.     SRO Nicholson was still in his field training when he handcuffed and arrested A.V.

93.     Despite his own limited and outdated training and lack of experience with middle-school aged students, SRO Peterson was chosen to supervise and observe SRO Nicholson in the field to train him to be an SRO at Sagewood Middle School.  SRO Peterson was thus supervising SRO Nicholson on August 29, 2019 at the time of the incident.

94.     SRO Peterson commended SRO Nicholson's actions after the incident with A.V. and commented that Nicholson did a "great" and "outstanding job" handling the "highly stressful call."

95.     Peterson commented that Nicholson was "prepared to handle his new role as the Sagewood SRO . . . and he has the knowledge and skill set to be a [sic] great SRO."

96.     On September 4, 2019, just four school days after the incident with A.V., Nicholson was recommended to advance out of SRO training to solo status, because he was deemed to have successfully completed the SRO field training program.

97.     Nicholson advanced out of field training even though he clearly violated numerous Sheriff's Office policies in mishandling the situation with A.V, not to mention the numerous violations of A.V.'s rights.

98.     SROs Nicholson, Peterson, and Coyle violated the following DCSO policies in the situation with A.V.:

    a.  Policies that require officers to use discretion and the least coercive intervention and to consider alternatives to arrest when dealing with juveniles and people with mental health disorders and disabilities;

    b.  Policies that require juveniles who are placed in custody to be transported "without delay" to the juvenile assessment center; and

    c.  Policies on detainee transportation that require that officers transport detainees who become "sick or injured incidental to an arrest" to an appropriate medical facility as soon as possible or otherwise request paramedics.

99.     The SROs violated these policies because: (1) they did not consider alternatives to incarceration throughout the incident; (2) they left A.V. handcuffed in the patrol car for over two hours rather than transporting him immediately; and (3) they did not take A.V. to get medical attention despite knowing that A.V. was banging his head and was dysregulated, and that his father said he needed to be taken to the Children's Hospital.

100.    No SRO was disciplined due to the incident, and in fact, the SROs were rewarded for their performance or complimented each other on their performance.

**The Sheriff's Office and School District Have a Pattern and Practice of Mishandling Situations Involving Students with Disabilities**

101.    The Douglas County School District and Sheriff's Office have a pattern and practice of their employees and agents mishandling situations involving students with disabilities.

102.    They have a pattern and practice of disproportionately putting children with disabilities into restraints, secluding them, and referring them to law enforcement.

103.    In the 2018-2019 school year, the Douglas County School District used the highest number of restraints and seclusions on students out of any school district in Colorado, with 352 total restraints and 79 total seclusions.[3]

104.    According to the School District's own "Restraint Reports" from 2016-2019, 71.9% of the time when interventions such as restraints were used, they were used on children who had "center-based" learning needs and/or moderate needs.

105.    Additionally, according to a Colorado Department of Education report, during the 2018-2019 school year, 29.6% of students in the Douglas County School District who were referred to law enforcement were special education students.[4]

106.    Furthermore, several other incidents in Douglas County schools reflect the pattern and practice in which the School District and Sheriff's Office—and/or their agents— inappropriately handle children with disabilities and inappropriately ensnare them in the criminal justice system.

---

[3] Melanie Asmar, *Behind Closed Doors: When it Comes to Seclusion and Restraint, Colorado Schools 'are Investigating Themselves,'* CHALKBEAT, Feb. 20, 2020, https://co.chalkbeat.org/2020/2/20/21178602/behind-closed-doors-when-it-comes-to-seclusion-and-restraint-colorado-schools-are-investigating-them

[4] This study also showed that 13 out of the 27 students in Defendant School Dsitrict who were referred to law enforcement in the 2018-2019 school year were Hispanic (48%), even though only about 15% of students in the district are Hispanic.

107.    For example, in October 2015, a few years prior to this incident, a ten-year-old child with autism at a Douglas County school got into a schoolyard altercation, and as in this case, there, the child was criminally charged with assault and harassment.[5]  There were two protests at the courthouse in response to these criminal charges, in which parents and autism advocates suggested that children with autism in Douglas County schools were criminalized for their autism.[6]  Charges against the child were dismissed over two years after the incident occurred.[7]

108.    The pattern continued with another incident in December 2019 at Sagewood Middle School—the same school that A.V. attended.  During that incident, a teacher claimed that a 12-year-old child with autism and other disabilities spit on her when he was escalated.  In response, SRO Nicholson—the same SRO who had handcuffed A.V.—aggressively handcuffed the child and left the child in handcuffs for three hours.  The child was criminally charged.  The child had bruises and marks on his wrists for several days.  He had persistent nightmares and could hardly sleep afterwards, and he is now terrified of police.

**The Sheriff and School District Knew of the Risk that SROs Would Violate the Rights of Children with Disabilities with their Present Training and their Failure to Provide Adequate Training Was A Moving Force Behind the Injuries Here**

109.    The School District and Sheriff were aware or should have been aware, based on their own statistical data and specific incidents, that their present training for school staff—including SROs—posed a risk that students' rights would be violated, and that further training regarding interacting with students with disabilities was needed to prevent or reduce that risk.

---

[5] Grant Stringer, *After Schoolyard Altercation, Child with Autism Charged with Assault,* WESTWORD, July 17, 2017, https://www.westword.com/news/autistic-child-logan-thompson-charged-with-assault-in-douglas-county-9266351.
[6] *Id.*
[7] *Id.*

110.    Indeed, the Douglas County School District had also entered into multiple Resolution Agreements with the U.S. Department of Education Office for Civil Rights ("OCR") after incidents involving its mishandling of students with disabilities, including but not limited to: (1) a 2016 agreement in which the School District promised to provide training to all School personnel at a particular Douglas County school regarding disability discrimination; (2) a 2018 agreement in which the School District promised to train staff and administrators at a particular Douglas County school on providing a least restrictive environment to students with disabilities; and (3) an agreement entered into in July 2019 in which the School District promised to train staff and administrators at a particular Douglas County School on disability discrimination.

111.    Each of these Resolution Agreements showed that the School District and the Sheriff were aware that their present training posed a risk that students' rights would be violated, and that further training was needed for SROs across the District, and not just in the schools subject to the Resolution Agreements, to prevent or reduce that risk.

112.    In addition, national and local news coverage of SRO interactions with children with disabilities made or should have made the School District and Sheriff aware of the risks that students' rights would be violated if they did not provide further training on handling students with disabilities.

113.    In July 2018, multiple national news stories were published about a mother suing the city of Flint, Michigan after an SRO handcuffed her seven-year-old son for about an hour during an afterschool program.[8]

---

[8] Associated Press, *Lawsuit: 7-year-old Boy Handcuffed By Officer in School,* FOX NEWS, Jul. 31, 2018, https://www.foxnews.com/us/lawsuit-7-year-old-boy-handcuffed-by-officer-in-school.

114.    Similarly, on August 13, 2018, about a year before the incident with A.V., ABC news published online and televised national stories about a ten-year-old boy with autism who was handcuffed by an SRO in Denton, Texas.[9]

115.    Prior to that, in October 2015, national news organizations published a widely-circulated video of an SRO violently throwing a South Carolina high school student and her desk to the ground and dragging her along the ground.[10]  News stories continued to be published as the SRO was fired and state and federal investigations were launched.[11]

116.    Moreover, local news stories, that were closer in time and location to Douglas County, should have made Defendant Sheriff and School District aware of these issues.

117.    In April 2019, just four months prior to the incident involving A.V., Channel 9 News published and televised several news stories detailing the handcuffing of a seven-year-old at a public elementary school in Denver.[12]

118.    One month later, news sources reported on another handcuffing of a child in a Denver public school: this time an eleven-year-old with disabilities.[13]

---

[9] Joeeta Biswas, *Parents to Sue After 10-Year-Old Boy With Autism Repeatedly Pinned To The Ground, Handcuffed By Officer,* ABC NEWS, Aug. 13, 2018, https://abcnews.go.com/News/parents-sue-10-year-boy-autism-repeatedly-pinned/story?id=57144546

[10] Dana Ford, Greg Botelho & Kevin Conlon, *Spring Valley High School Officer Suspended After Violent Classroom Arrest*, CNN (Oct. 27, 2015, 10:12 PM), http://edition.cnn.com/2015/10/27/us/south-carolina-school-arrest-video//

[11] Craig Melvin & Erik Ortiz, *South Carolina Deputy Ben Fields Fired After Body Slamming Student: Sheriff*, NBC NEWS (Oct. 28, 2015, 12:34 PM), http://www.nbcnews.com/news/us-news/sheriff-announce-south-carolina-deputy-ben-fields-be-fired-sources-n452881.

[12] 9 News, *Father Speaks Out About 7-Year-Old Son Being Handcuffed by Denver Public School Safety Employees*, May 1, 2019, https://www.9news.com/video/news/investigations/father-speaks-out-about-7-year-old-son-being-handcuffed-by-denver-public-school-safety-employees/73-1b4a350b-13db-4d31-b3f5-ebf4e2aedfdd?jwsource=cl.

[13] Melanie Asmar, *Hancuffed in Denver in the Fifth Grade: 'Whenever I Shut My Eyes, I Saw the Cuffs,'* CHALKBEAT, May 30, 2019, https://chalkbeat.org/posts/co/2019/05/30/handcuffed-in-denver-in-the-fifth-grade-whenever-i-shut-my-eyes-i-saw-the-cuffs/ (May 30, 2019).

119.     News channels widely reported that the Board of Education in Denver changed its policies as a result of these two instances so that SROs could no longer handcuff elementary school students unless the student was openly displaying a deadly weapon, and SROs were discouraged from handcuffing middle school and high school students.[14]

120.     National studies and statistics also made or should have made the Defendant School District and Sheriff aware of the risks that students' rights would be violated if they did not provide further training on handling students with disabilities.

121.     A recent analysis of 2011-12 data by the U.S. Department of Education Office for Civil Rights revealed that although students with disabilities account for only 12% of public school students, they comprise 75% of students subjected to physical restraint in schools.[15]

122.     In 2009, the U.S. Government Accountability Office ("GAO") published the results of a nationwide study documenting hundreds of uses of restraints in schools between 1990 and 2009, including 20 restraints that resulted in the death of a child.[16]  Nearly all of the incidents investigated by the GAO involved children with disabilities.

123.     That same year, in testimony before the U.S. House of Representatives Education and Labor Committee, the GAO presented these findings and reported on the risks of injury and death associated with the restraint of children.  The GAO explained that even in situations where

---

[14] Melanie Asmar, *Denver School Board Bans Use of Handcuffs on Elementary School Students*, DENVER POST, June 14, 2019, https://www.denverpost.com/2019/06/14/denver-school-board-bans-use-of-handcuffs-on-elementary-school-students/ (June 14, 2019).
[15] U.S. DEP'T OF EDUCATION OFFICE FOR CIVIL RIGHTS, ISSUE BRIEF NO. 1: SCHOOL DISCIPLINE, RESTRAINT & SECLUSION HIGHLIGHTS 9 (Mar. 2014).
[16] Statement of Gregory D. Kutz, Managing Director of Forensic Audits and Special Investigations, U.S. Government Accountability Office, to Committee on Education and Labor, U.S. House of Representatives 8 (May 2009), at http://www.gao.gov/new.items/d09719t.pdf.

a child does not sustain any physical injury as a result of restraint, he is often severely traumatized.[17]

124.    In January 2019, the U.S. Department of Education announced an initiative on the inappropriate use of restraint and seclusion, and in July 2019, its agencies provided a presentation to educational agencies about how the use of restraint and seclusion may result in unlawful discrimination against students with disabilities and on steps public schools must and can take to prevent the inappropriate use of restraint and seclusion on children with disabilities.[18]

125.    These national studies and presentations should have informed the School District and Sheriff that further training was necessary regarding putting children with disabilities in restraints and the risk of not providing this further training.

126.    Despite their knowledge of the need for more effective training, and despite their knowledge of the risks of failing to meet that need, the Sheriff and School District failed to provide effective additional training to SROs on interacting with students with disabilities.

127.    The School District and Sheriff's pattern and practice, and their lack of adequate and effective training of SROs, were the moving forces behind the injuries to A.V. and the violations of his rights.

## FIRST CLAIM FOR RELIEF
### (Violations of the Americans with Disabilities Act- 42 U.S.C. § 12131)
*Against Defendant Tony Spurlock in his official capacity and Defendant Douglas County School District*

128.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

---

[17] *Id.* at 1.
[18] U.S. Department of Education Office of Civil Rights, *Civil Rights Data Collection (CRDC): Technical Assistance on Restraint and Seclusion,* https://www2.ed.gov/about/offices/list/ocr/data.html?src=image.

129.     Title II of the ADA prohibits public entities from discrimination on the basis of a disability.  42 U.S.C. § 12131(1)(B)).

130.     A.V. is a qualified individual with a disability under the ADA.  He has autism and serious emotional disabilities, which substantially limit his major life activities by causing him to be triggered by touch, and causing him challenges in his ability to communicate and manage emotions.

131.     Through the SROs, Defendant Sheriff and School District denied A.V. reasonable accommodations.

132.     Because the SROs denied A.V. reasonable accommodations, the Sheriff and School District caused A.V. to suffer greater injury and indignity in those processes than other arrestees.

133.     The SROs knew that accommodations were necessary under Douglas County Sheriff's Office policies, but were indifferent to an obvious risk of not providing the accommodations.

134.     The Sheriff and School District are liable for the actions of the SROs because they jointly employed the SROs and the SROs served as their agents.

135.     The Sheriff and School District also denied A.V. the benefit of properly trained SROs in Sagewood Middle School who would be trained to appropriately interact with students with disabilities and reasonably accommodate those students.

136.     The Sheriff and School District were on notice of the need for more or different training, but were deliberately indifferent to that need.

137.   As a proximate result of Defendant Sheriff's and School District's actions and inactions, A.V. suffered physically and emotionally, and continues to experience fear, distrust, and anxiety regarding law enforcement officers.

138.   As a result of the Sheriff's and School District's violations of Title II of the ADA, A.V. is entitled to compensatory damages, and reasonable attorneys' fees and costs.

## SECOND CLAIM FOR RELIEF
### (Violations of the Rehabilitation Act- 29 U.S.C. § 794)
*Against Defendant Tony Spurlock in his official capacity and Defendant Douglas County School District*

139.   Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

140.   Section 504 of the RA forbids programs that receive federal financial assistance to discriminate against individuals with a disability solely because of their disability.  29 U.S.C. § 794(a).

141.   The Sheriff's Office and School District receive federal financial assistance.

142.   A.V. is a qualified individual with a disability under the Rehabilitation Act.

143.   Through the SROs, the Sheriff and School District denied A.V. reasonable accommodations.

144.   Because the SROs denied A.V. reasonable accommodations, Defendant Sheriff and School District caused A.V. to suffer greater injury and indignity in those processes than other arrestees.

145.   The SROs knew that accommodations were necessary under Douglas County Sheriff's Office policies, but were indifferent to an obvious risk of not providing the accommodations.

146.   The SROs discriminated against A.V. solely as a result of his disability.

147.    The Sheriff and School District are liable for the actions of the SROs because they jointly employed the SROs and the SROs served as their agents.

148.    As a proximate result of Defendant Sheriff's and School District's actions and inactions, A.V. suffered physically and emotionally, and continues to experience fear, distrust, and anxiety regarding law enforcement officers.

149.    As a result of the Sheriff's and School District's violations of Section 504 of the Rehabilitation Act, A.V. is entitled to compensatory damages, and reasonable attorneys' fees and costs.

**THIRD CLAIM FOR RELIEF**
**(Violations of the Fourth Amendment Pursuant to 42 U.S.C. § 1983)**
*Against All Defendants*

150.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

151.    The Fourth Amendment forbids unreasonable seizures, which include seizures carried out with excessive force.

152.    SROs Nicholson, Peterson, and Coyle used excessive force in seizing A.V. violation of A.V.'s Fourth Amendment rights by handcuffing A.V. unduly aggressively and then forcing him to remain handcuffed and restrained for an excessively lengthy period of time.

153.    SROs Nicholson, Peterson, and Coyle unreasonably and unconstitutionally seized A.V. and used excessive force in light of the totality of the circumstances, including but not limited to:

a.   That A.V. had not engaged in serious criminal activity;

b.   That A.V. posed no real physical threat to anyone;

c.   That A.V. was not attempting to flee school grounds;

d.   A.V.'s age, size, and disabilities;

23

e.   The failure of the SROs to appropriately approach and handle a child of A.V.'s age, size, and with A.V.'s disabilities; and

f.   The SROs' aggressive and threatening actions that prompted A.V. to re-escalate.

154.   A.V.'s right to be free from unreasonable seizure and excessive force as described herein was clearly established at the time SROs Nicholson, Peterson, and Coyle handcuffed him and kept him in handcuffs for hours.

155.   The Sheriff's Office and School District, and their joint employees and agents, SROs Nicholson, Peterson, and Coyle, often interact with students with disabilities and thus the circumstances constituted a usual and recurring situation.

156.   The School District and Sheriff's Office failed to adequately train and supervise SROs, despite foreseeable consequences of such failure, on appropriately interacting with children with disabilities.  That deliberately indifferent failure to train was a proximate cause of the violations of A.V.'s Fourth Amendment rights.

157.   As a proximate result of all Defendants' actions and inactions, A.V. suffered physically and emotionally, and continues to experience fear, distrust, and anxiety regarding law enforcement officers.

158.   A.V. is entitled to compensatory damages, punitive damages from the individual defendants, and reasonable attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

(a)   Compensatory damages from the School District, Sheriff, and SROs sued in their individual capacities;

(b)     Punitive damages from the SROs sued in their individual capacities;

(b)     An award of reasonable attorney's fees and costs associated with this action on all

claims allowed by law;

(c)     Pre and post-judgment interest at the lawful rate;

(d)     Any further relief that this Court deems just and proper in equity and at law.

## JURY DEMAND

Plaintiff requests a trial by jury in this matter.

Respectfully submitted this 9th day of March, 2021.

> *s/ Jack D. Robinson*
> Jack D. Robinson, #22037
> SPIES, POWERS & ROBINSON, P.C.
> 1660 Lincoln Street, Suite 2220
> Denver, Colorado 80264
> Telephone: (303) 830-7090
> robinson@sprlaw.net
>
> *In cooperation with the ACLU Foundation of Colorado*
>
> *s/ Mark Silverstein*
> Mark Silverstein
> Sara R. Neel
> Arielle Herzberg
> American Civil Liberties Foundation of Colorado
> 303 E. 17th Avenue Suite 350
> Denver, Colorado 80203
> Phone: (720) 402-3104
> msilverstein@aclu-co.org
> sneel@aclu-co.org
> aherzberg@aclu-co.org
>
> ATTORNEYS FOR PLAINTIFF