**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 21-cv-0704-WJM-SKC

A.V., a child, through his mother and next friend, MICHELLE HANSON,

     Plaintiff,

v.

DOUGLAS COUNTY SCHOOL DISTRICT RE-1,
TONY SPURLOCK, the Douglas County Sheriff, in his official capacity;
SIDNEY NICHOLSON, a Douglas County School Resource Officer, in his individual capacity,
LYLE PETERSON, a Douglas County School Resource Officer, in his individual capacity, and
DANIEL COYLE, a Douglas County School Resource Officer, in his individual capacity,

     Defendants.

---

**ORDER GRANTING DOUGLAS COUNTY SCHOOL DISTRICT RE-1'S
MOTION TO DISMISS, GRANTING IN PART AND DENYING IN PART
THE DCSO DEFENDANTS' MOTION TO DISMISS, AND
AFFIRMING OCTOBER 26, 2021 ORDER RE: MOTION TO STAY**

---

This matter is before the Court on Defendant Douglas County School District RE-1's (the "District") Motion to Dismiss ("District's Motion to Dismiss") (ECF No. 28), as well as the Motion to Dismiss filed by Defendants Tony Spurlock, in his official capacity as the Douglas County Sheriff ("DCSO"), and Sidney Nicholson, Lyle Peterson, and Daniel Coyle in their individual capacities[1] (collectively, the "DCSO Defendants") ("DCSO Defendants' Motion to Dismiss") (ECF No. 23).

Also before the Court is the DCSO Defendants' Objections ("Objections") (ECF No. 63) to United States Magistrate Judge S. Kato Crews's October 26, 2021 Order RE:

---

[1] At times, the Court refers to Nicholson, Peterson, and Coyle collectively as School Resource Officers ("SROs").

Motion to Stay [Dkt. 24] ("Order Denying Motion to Stay") (ECF No. 62).  The Order Denying Motion to Stay is incorporated herein by reference.  *See* 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(a).

For the reasons explained below, the Court grants in part and denies in part the DCSO Defendants' Motion to Dismiss, grants the District's Motion to Dismiss, overrules the Objections, and affirms Judge Crews's Order Denying Motion to Stay.

## I.  BACKGROUND[2]

The Court assumes the allegations contained in the Complaint and Jury Demand are true for the purpose of resolving the DCSO Defendants' Motion to Dismiss and the District's Motion to Dismiss.  *See Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007).

Plaintiff A.V. is a minor who, at the time of the events giving rise to this lawsuit, was an eleven-year-old child with autism at Sagewood Middle School, a public school in the District.  (¶¶ 10, 15, 18.)  Plaintiff's disability causes him to avoid some sensory stimuli, to be triggered by touch and loud sounds, and to have difficulty managing his response to frustration, expressing emotions, wants, and needs, and handling some transitions.  (¶ 19.)

At the time of the events giving rise to this lawsuit, Spurlock was the Douglas County Sheriff, had final policymaking authority for the DCSO, and is the official responsible for ensuring that the DCSO and its employees comply with the United States Constitution, as well as federal and state law.  (¶ 12.)  Nicholson, Peterson, and Coyle were all Douglas County Sheriff's Deputies who Plaintiff alleges were "jointly

---

[2] References to (¶ __), without more, are references to the Complaint and Jury Demand (the "Complaint").  (ECF No. 1.)

employed" by the District.  (¶ 13.)

## A.    The Events of August 29, 2019

On August 29, 2019, Plaintiff's classmate wrote on Plaintiff with a marker, causing him to become "escalated."  (¶ 24.)  Plaintiff responded by "poking" his classmate with a pencil, causing the classmate "to have a small cut on his arm."  (¶ 25.) After this incident, a classroom aide texted school administrators that she needed help with Plaintiff; in response, the Dean of Students, Dr. Christine Funk, and the Principal, Ben D'Ardenne, reported to the classroom.  (¶¶ 27–28.)  Dr. Funk and Mr. D'Ardenne requested that Plaintiff leave the classroom, and Plaintiff complied.  (¶ 29.)  Dr. Funk and Mr. D'Ardenne also state that Plaintiff "pushed past him as he was leaving."  (¶ 30.)

Thereafter, Plaintiff met with Dr. Smrcka, the school psychologist, and Plaintiff "de-escalated" while listening to special sensory music through his headphones.  (¶¶ 31–33.)

Principal D'Ardenne texted Nicholson, the School Resource Officer assigned to Sagewood Middle School, about the argument between Plaintiff and his classmate.  (¶ 34.)  While Plaintiff was sitting with Dr. Smrcka, Nicholson and Peterson arrived at Sagewood Middle School.  (¶ 35.)  Mr. D'Ardenne explained to Nicholson and Peterson that the classmate had asked Plaintiff to stop doing something in class and that Plaintiff responded by "stabbing" the classmate with a pencil.  (¶ 36.)  He further explained to Nicholson and Peterson that Plaintiff had serious emotional disabilities and that although Plaintiff had calmed down, he was worried that Plaintiff may become re-escalated.  (¶¶ 38–39.)  Nicholson responded by proposing that he ask Plaintiff to come talk to him in the SRO office and stated, "If he wants to come, that's fine; if he doesn't, that's fine too."  (¶ 40.)  Mr. D'Ardenne agreed to that plan.  (*Id.*)

When Nicholson asked Plaintiff to come talk to him in his office, Plaintiff shook his head "no." (¶ 42.) Dr. Smrcka explained that Plaintiff was not highly verbal and that he tends not to talk. (¶ 43.) Nonetheless, Nicholson continued to ask Plaintiff if he would come talk in the SRO office, and Plaintiff stared blankly and occasionally shook his head "no" in response. (¶ 44.) According to Plaintiff, "despite the fact that [he] was sitting quietly and that there was no emergency requiring immediate intervention, SRO Nicholson and Peterson abruptly approached [Plaintiff] in a threatening manner and aggressively handcuffed him." (¶ 45.) Nicholson and Peterson "did not consider any alternatives, such as asking [Plaintiff's] psychologist or classroom aide to bring [Plaintiff] to the SROs' office or asking for [Plaintiff's] parents to come to school and bring [Plaintiff] to their office," and instead opted for an approach that "would surely cause [Plaintiff] to become re-escalated." (¶¶ 46–47.)

Nicholson took hold of Plaintiff's right arm, and Peterson took his left arm above the elbow to get Plaintiff in handcuffs. (¶ 48.) Plaintiff screamed, "ow," and "stop, you're hurting me!" (*Id.*) He also kicked the bottom of a table, wiggled his arms, and banged his head against the concrete wall of the school. (¶¶ 48–49.) Nicholson then grabbed Plaintiff's head at the nape of his neck and held it tightly, to which Plaintiff yelled, "Ow! You're choking me! Ow!" (¶ 51.)

Plaintiff alleges that after Nicholson and Peterson handcuffed him, they "paraded" him through the school hallways as Plaintiff was pushing back against them and crying. (¶ 52.) Plaintiff asserts that Nicholson and Peterson "erroneously interpreted [Plaintiff's] reactions as 'resisting' and being violent.'" (¶ 53.) Thereafter, Nicholson and Peterson pushed Plaintiff toward the patrol car and refused Plaintiff's

requests to remove the handcuffs.  (¶¶ 54–55.)  Once he was seated in the patrol car, Nicholson and Peterson saw and heard Plaintiff banging his head loudly against the plexiglass.  (¶¶ 56, 60.)  Nonetheless, they left Plaintiff banging his head in the car and ignored Principal D'Ardenne's "warning about [Plaintiff] inflicting self-harm in the past." (¶ 61.)  While Nicholson collected witness statements, Peterson stayed near the patrol car, where Plaintiff sat handcuffed for more than two hours.  (¶ 62.)

Coyle, a SRO assigned to another school, arrived at Sagewood Middle School at some point while Plaintiff was still sitting handcuffed in the patrol car; however, he neither uncuffed Plaintiff nor did anything to stop him from banging his head.  (¶ 65.)

When Plaintiff's stepfather arrived at the school, Plaintiff was still sitting handcuffed in the patrol car.  (¶ 66.)  Nicholson informed Plaintiff's stepfather that Plaintiff would be taken to a juvenile detention center and was being charged for stabbing a student with a pencil and assaulting a police officer.  (¶ 68.)  Nicholson also said that Plaintiff could be charged with harassing the principal and another teacher, but that the school staff did not want to press charges.  (¶ 68.)  Plaintiff's stepfather replied, "I mean this is crazy.  This is a kid with autism and you guys are gonna press charges against him?"  (¶ 69.)  Plaintiff's stepfather explained that "[t]his is a kid with autism that's obviously dysregulated" and requested that Plaintiff be taken to Children's Hospital.  (¶¶ 69–70.)  Nonetheless, Nicholson, Peterson, and Coyle "did not change course or get [Plaintiff] medical attention" and would not let Plaintiff's stepfather see Plaintiff.  (¶¶ 67, 71.)

Thereafter, Nicholson, Peterson, and Coyle moved Plaintiff to a different police car and left him in handcuffs while Coyle drove Plaintiff to the juvenile detention center.

(¶¶ 72–74.)  Neither the SROs nor anyone at the juvenile detention center obtained medical attention for the child.  (¶¶ 75–76.)  According to Plaintiff, Nicholson, Peterson, and Coyle "discriminated against [Plaintiff] because of his disabilities when they determined not to get him medical attention."  (¶ 77.)

Plaintiff was charged with misdemeanor assault for allegedly causing injury to his classmate, two charges of misdemeanor harassment for allegedly striking school staff, as well as second degree felony assault of a peace officer and a misdemeanor of resisting arrest.  (¶ 79.)  He remained at the juvenile detention center until that evening when his parents posted a $25,000 bond to release him.  (¶ 78.)  Notably, the criminal charges against Plaintiff have all since been dropped.  (¶ 79.)

Following the incident, Plaintiff had a headache, a 5-centimeter hematoma on his forehead from banging his head, and swollen wrists from the handcuffs.  (¶¶ 81–82.) According to Plaintiff, he suffered emotionally from the incident and demonstrates fear, distrust, and anxiety when interacting with law enforcement officers.  (¶ 84.)

**B.    Allegations Regarding SRO Trainings & Prior Situations Involving Students**

Plaintiff alleges that the DCSO and the District split the costs of the SROs' salaries, benefits, and trainings and that the SROs were agents of both the DCSO and the District.  (¶ 86.)  He also alleges, *inter alia*, that "SROs receive little or no training on interacting with students with disabilities, how to approach such students, how to de-escalate such students, how to keep these students safe, or when to seek medical attention for such students."  (¶ 87.)

Plaintiff further alleges that in the 2018–2019 school year, the District used the highest number of restraints and seclusions on students out of any school district in

Colorado, with 352 total restraints and 79 total seclusions.  (¶ 103.)  Moreover, Plaintiff alleges that: (1) according to the District's own "Restraint Reports" from 2016–2019, 71.9% of the time when interventions such as restraints were used, they were used on children who had "center-based" learning needs and/or moderate needs; and (2) according to a Colorado Department of Education report, during the 2018–2019 school year, 29.6% of students in the District who were referred to law enforcement were special education students.  (¶¶ 104–05.)  Plaintiff further points to other incidents in schools within the District which he contends that "reflect a pattern and practice in which the [ ] District and Sheriff's Office—and/or their agents—inappropriately handle children with disabilities and inappropriately ensnare them in the criminal justice system.  (¶¶ 106–08.)

## C.    Procedural History

Plaintiff, through his mother and next friend, Michelle Hanson, filed this action on March 9, 2021.  (ECF No. 1.)  In his Complaint, Plaintiff asserts the following claims: (1) an Americans with Disabilities Act ("ADA") claim, 42 U.S.C. § 12131, against DCSO and the District (¶¶ 128–38); (2) a Rehabilitation Act claim, 29 U.S.C. § 794, against DCSO and the District (¶¶ 139–49); and (3) a Fourth Amendment excessive force claim pursuant to 42 U.S.C. § 1983 against DCSO, Defendants Nicholson, Peterson, and Coyle in their individual capacities, and the District (¶¶ 150–58).

On May 10, 2021, the DCSO Defendants filed the DCSO Defendants' Motion to Dismiss.  (ECF No. 23.)  Plaintiff responded on June 14, 2021 (ECF No. 47), and the DCSO Defendants replied on July 6, 2021 (ECF No. 58).

Also on May 10, 2021, the DCSO Defendants filed the DCSO Defendants'

Motion to Stay Discovery Pending Immunity Determination ("Motion to Stay").  (ECF No. 24.)  Judge Crews issued the Order Denying Motion to Stay on October 26, 2021.  (ECF No. 62.)  The DCSO Defendants filed their Objections pursuant to Federal Rule of Civil Procedure 72(a) to Judge Crew's Order Denying Motion to Stay on November 9, 2021 (ECF No. 63), and Plaintiff responded to the Objections on November 23, 2021 (ECF No. 65).

On May 24, 2021, the District filed the District's Motion to Dismiss.  (ECF No. 28.)  Plaintiff responded on June 28, 2021 (ECF No. 53), and the District replied on July 12, 2021 (ECF No. 60).

On June 24, 2021, the U.S. Department of Justice filed a helpful Statement of Interest ("Statement of Interest") under 28 U.S.C. § 517 to address the application of Title II of the ADA to arrests.  (ECF No. 51.)  The DCSO Defendants responded to the Statement of Interest on July 15, 2021.  (ECF No. 61.)

## II. LEGAL STANDARDS

### A.    Federal Rule of Civil Procedure 12(b)(6)

Under Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss a claim in a complaint for "failure to state a claim upon which relief can be granted."  In reviewing a motion to dismiss under Rule 12(b)(6), the Court will "assume the truth of the plaintiff's well-pleaded factual allegations and view them in the light most favorable to the plaintiff."  *Ridge at Red Hawk, L.L.C.*, 493 F.3d at 1177.  "[T]o withstand a motion to dismiss, a complaint must contain enough allegations of fact 'to state a claim to relief that is plausible on its face.'"  *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)).  This means that "[t]he burden is on the plaintiff to frame a 'complaint with enough factual matter (taken

as true) to suggest' that he or she is entitled to relief.  'Factual allegations must be enough to raise a right to relief above the speculative level.'"  *Id.* (quoting *Twombly,* 550 U.S. at 545 & 556).  The plaintiff "does not need detailed factual allegations" but must plead more than merely "labels and conclusions" or "a formulaic recitation of the elements of a cause of action."  *Id.*  "[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely."  *Ridge at Red Hawk, L.L.C.*, 493 F.3d at 1177 (quoting *Twombly*, 550 U.S. at 556).

## B.    Federal Rule of Civil Procedure 72(a)

When reviewing an objection to a magistrate judge's non-dispositive ruling, the Court must affirm the ruling unless it finds that the ruling is "clearly erroneous or contrary to law."  Fed. R. Civ. P. 72(a); 28 U.S.C. § 636(b)(1)(A); *Ariza v. U.S. W. Commc'ns, Inc.*, 167 F.R.D. 131, 133 (D. Colo. 1996).  The clearly erroneous standard "requires that the reviewing court affirm unless it on the entire evidence is left with the definite and firm conviction that a mistake has been committed."  *Ocelot Oil Corp. v. Sparrow Indus.*, 847 F.2d 1458, 1464 (10th Cir. 1988) (internal quotation marks omitted).  The "contrary to law" standard permits "plenary review as to matters of law," *see* 12 Charles Alan Wright *et al.*, Federal Practice & Procedure § 3069 (2d ed., Apr. 2016 update), but the Court will set aside a magistrate judge's order only if it applied the wrong legal standard or applied the appropriate legal standard incorrectly, *see Wyoming v. U.S. Dep't of Agric.*, 239 F. Supp. 2d 1219, 1236 (D. Wyo. 2002).  In short, "[b]ecause a magistrate judge is afforded broad discretion in the resolution of non-dispositive . . . disputes, the court will overrule the magistrate judge's determination only if his discretion is abused."  *Ariza*, 167 F.R.D. at 133.

## III. THE DCSO DEFENDANTS' MOTION TO DISMISS

**A.    Title II of the ADA & Rehabilitation Act Claims**

Title II of the ADA commands that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  The ADA broadly defines a "qualified individual with a disability" as anyone who "meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity."  *Id.* § 12131(2).

Likewise, Section 504 of the Rehabilitation Act provides that

> [n]o otherwise qualified individual with a disability in the
> United States, . . . shall, solely by reason of her or his
> disability, be excluded from the participation in, be denied
> the benefits of, or be subjected to discrimination under any
> program or activity receiving Federal financial assistance or
> under any program or activity conducted by any Executive
> agency or by the United States Postal Service. . . .

29 U.S.C. § 794(a).

To state a claim under Title II of the ADA, a plaintiff must allege: (1) that he is a qualified individual with a disability; (2) that he was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) that such exclusion, denial of benefits, or discrimination was by reason of the plaintiff's disability.  *Gohier v. Enright*, 186 F.3d 1216, 1219 (10th Cir. 1999).[3]

---

[3] Because the same substantive standards apply to a Rehabilitation Act claim, the Court's rulings with regard to the ADA claim apply with equal force to the Rehabilitation Act claim.  *See Cunningham v. Univ. of N.M. Bd. of Regents*, 531 F. App'x 909, 919 (10th Cir. 2013) (recognizing that the provisions of the ADA and the Rehabilitation Act involve the same

Although the Tenth Circuit has not decided the viability of a wrongful-arrest theory under the ADA, *see Clark v. Colbert*, 895 F.3d 1258, 1265 (10th Cir. 2018) ("we have never squarely held the ADA applies to arrests"), the Tenth Circuit has nonetheless identified two potential theories of Title II claims arising from arrests that federal courts have addressed:

> The first is that police wrongly arrested someone with a disability because they misperceived the effects of that disability as criminal activity.  The second is that, while police properly investigated and arrested a person with a disability for a crime unrelated to that disability, they failed to reasonably accommodate the person's disability in the course of investigation or arrest, causing the person to suffer greater injury or indignity in that process than other arrestees.
>
> . . .
>
> Accordingly, this court merely clarifies that a broad rule categorically excluding arrests from the scope of Title II . . . is not the law.  It remains an open question in this circuit whether to adopt either or both the wrongful-arrest theory . . . and the reasonable-accommodation-during-arrest theory . . . .

*Gohier*, 186 F.3d at 1220–21 (internal citations omitted).  Having been presented with no controlling case law to the contrary, the Court will assume for purposes of this Order that Title II of the ADA applies to arrests.

> 1.   Misperceiving the Effects of a Disability as Criminal Activity

A wrongful arrest claim under Title II has been described as one in which "police wrongly arrested someone with a disability because they misperceived the effects of that disability as criminal activity."  *Id.* at 1220.  In describing the parameters of a

---

standards); *Sanchez v. Vilsack*, 695 F.3d 1174, 1177 n.2 (10th Cir. 2012) ("Regardless of whether suit is filed under the Rehabilitation Act or under the [ADA], the substantive standards for determining whether an individual is disabled are the same.").

wrongful-arrest theory, the Tenth Circuit has referenced two cases in which district

courts declined to dismiss ADA claims alleging that police had arrested, and, in one

case, beaten, persons with disabilities who had not committed any crime:

> The police in each case misperceived the effects of a
> disability as illegal conduct.  In *Lewis* [*v. Truitt*, 960 F. Supp.
> 175, 176–77 (S.D. Ind. 1997)], they beat and arrested, for
> the offense of resisting law enforcement, a deaf man who
> could not understand their command; in *Jackson* [*v.
> Inhabitants of Town of Sanford*, 1994 WL 589617, at *1 (D.
> Me. Sept. 23, 1994)], they arrested for drunk driving a man
> who was sober, and whose unsteadiness and slurred
> speech resulted from a past stroke.

*Id.*

However, the Tenth Circuit has drawn a distinction between cases in which a

disability might cause the police to incorrectly suspect than an individual committed a

crime and other instances in which a defendant's conduct *was* in fact unlawful.  For

example, in *J.H. ex rel. J.P. v. Bernalillo County*, 806 F.3d 1255 (10th Cir. 2015), the

Tenth Circuit reasoned as follows:

> J.P. was in a special needs class, but no one questions her
> ability to form the intent necessary to commit a battery by
> kicking her teacher.  It was that battery, rather than a
> disability, that led to the arrest.  As a result, the arrest did not
> constitute discrimination against J.P. based on her alleged
> disability.  *See Roberts v. City of Omaha*, 723 F.3d 966,
> 973–74 (8th Cir. 2013) (holding that the police did not
> discriminate under the [ADA] when arresting a man with
> paranoid schizophrenia who had attacked his family
> members).

*Id.* at 1260; *see also Scott v. City of Albuquerque*, 711 F. App'x 871, 884 (10th Cir.

2017) (recognizing that an "arrest based on the manifestation of a student's disability

was not equivalent to an arrest *because* of that disability" (emphasis in original)); *J.V. v.

Albuquerque Pub. Sch.*, 813 F.3d 1289, 1296 (10th Cir. 2016) (determining that police

"handcuffed [a student] based on his conduct—two hours of disruptive behavior, including running from room to room and kicking Ms. Martinez and Officer Sanchez and refusing to stop—not by reason of his disability").

The DCSO Defendants argue that Plaintiff's allegations "do not establish that the [SROs] misconceived Plaintiff's lawful conduct to be criminal activity; to the contrary, Plaintiff engaged in assaultive conduct that was *not* lawful." (ECF No. 23 at 4 (emphasis in original).) According to the DCSO Defendants, SROs "Nicholson and Peterson arrested Plaintiff based on probable cause that he had committed a crime, not based on an alleged disability, and Plaintiff does not dispute the existence of probable cause supporting his arrest." (*Id.* at 5.)

In response, Plaintiff contends that he "expects to prove that the SROs . . . arrested him in response [to] lawful conduct that resulted from his disability." (ECF No. 47 at 5.) He emphasizes that in this case, the SROs did not decide to arrest him immediately and instead only made that decision after Plaintiff failed to respond to the SROs' questions. (*Id.*)

To be sure, the Complaint sets forth allegations suggesting that Plaintiff had committed a battery against another student, which could give rise to probable cause supporting Plaintiff's arrest. However, assuming the truth of Plaintiff's well-pleaded factual allegations and viewing them in the light most favorable to the Plaintiff, Plaintiff's plausible allegations also raise the possibility that Defendants only decided to arrest Plaintiff after misperceiving his subsequent lawful conduct, which was the result of the disability. (*See* ¶ 40 ("SRO Nicholson responded by instead proposing that he ask [Plaintiff] to come talk to him in the SRO office and said: 'if he wants to come, that's fine;

if he doesn't, that's fine too.'"); ¶ 44 ("Nicholson continued to ask [Plaintiff] if he would

come talk in the SRO office.  [Plaintiff] stared blankly and occasionally shook his head

no in response."); ¶ 45 ("Then, despite the fact that [Plaintiff] was sitting quietly and that

there was no emergency requiring immediate intervention, SRO Nicholson and

Peterson abruptly approached [Plaintiff] in a threatening manner and aggressively

handcuffed him.").)

Accordingly, the Court denies this portion of the DCSO Defendants' Motion to

Dismiss.  Among other things, this will allow the parties additional time to develop the

factual record through discovery on the issue of what prompted the SROs to arrest

Plaintiff.

     2.    <u>Failing to Reasonably Accommodate Disability In the Course of Arrest</u>

Title II claims arising from arrests may also occur when law enforcement "failed

to reasonably accommodate the person's disability in the course of investigation or

arrest, causing the person to suffer greater injury or indignity in that process than other

arrestees."  *Gohier*, 186 F.3d at 1220–21.

The Tenth Circuit has recognized that:

> [a] public entity must provide a reasonable accommodation
> under the ADA when it knows that the individual is disabled
> and "requires an accommodation of some kind to participate
> in or receive the benefits of its services."  "[A] public entity is
> on notice that an individual needs an accommodation when
> it knows that an individual requires one, either because that
> need is obvious or because the individual requests an
> accommodation."

*J.V.*, 813 F.3d at 1299 (quoting *Robertson v. Las Animas Cnty. Sheriff's Dep't*, 500 F.3d

1185, 1195 (10th Cir. 2007)); *see also* 28 C.F.R. § 35.130(b)(7) (ADA regulations

require public entities to "make reasonable modifications in policies, practices, or

procedures when the modifications are necessary to avoid discrimination on the basis of disability.").

The DCSO Defendants argue that "[w]hile the Complaint includes several allegations that [SROs] Nicholson and Peterson were told at various times that Plaintiff had an emotional disability, those allegations alone do not establish a reasonable accommodation claim" because "Plaintiff must be able to demonstrate that the [SROs] knew Plaintiff needed an accommodation."  (ECF No. 23 at 6.)  They further argue that "[r]easonable accommodation does not obligate law enforcement to ignore illegal conduct, even where the party engaged in illegal activity is an eleven-year-old student alleged to have disabilities who engaged in assaultive conduct in a school setting."  (*Id.*)

In response, Plaintiff argues that "[t]he SROs . . . failed to provide reasonable accommodations in violation of the ADA and RA during (i) the handcuffing, (ii) in the patrol car, and (iii) in transport."  (ECF No. 47 at 6.)  According to the Plaintiff, "DCSO policies require the SROs to consider alternatives to arrest for people with mental health disorders" and that "[i]t was obvious that the DCSO alternatives-to-arrest policy applied." (*Id.* (citing ¶¶ 38–39, 43, 98(a)).)  Plaintiff further contends that it was "obvious that the SROs needed to move [him]" while he was banging his head on the patrol car and that "officers knew of a DCSO policy requiring officers to transport detainees who become 'sick or injured incidental to an arrest' to a medical facility as soon as possible."  (*Id.* at 7–8.)

The Court finds that Plaintiff has plausibly alleged that the SROs "failed to reasonably accommodate the person's disability in the course of investigation or arrest, causing the person to suffer greater injury or indignity in that process than other

arrestees." *Gohier*, 186 F.3d at 1220–21.  After all, Plaintiff alleges that: (1) Principal D'Ardenne informed Nicholson that Plaintiff is a "kid who's got an emotional disability, which is obviously why he's responding the way he is.  And he's got this history of self-harm" and that "I just want[ed] to make sure [they were] doing everything [they could] to make sure he's not in any position to harm himself 'cause I think he will try" (¶ 59), and (2) Plaintiff's stepfather informed the SROs that Plaintiff is "a kid with autism that's obviously dysregulated" and asked to take Plaintiff to Children's Hospital (¶¶ 69–70). Notwithstanding these advisements and warnings, as well as the fact that Plaintiff was repeatedly banging his head on the plexiglass and window of the patrol car while handcuffed (*see* ¶¶ 60–65), the SROs ignored Mr. D'Ardenne's warnings and otherwise failed to take other actions that would de-escalate the situation, calm Plaintiff down, prevent Plaintiff from hurting himself, or get Plaintiff medical attention.  (¶¶ 41–79.)

While it is true that mere knowledge of Plaintiff's diagnosis, without more, would not necessarily make the SROs aware that Plaintiff needed an accommodation, there are sufficient allegations set forth in the Complaint to suggest that Plaintiff had an obvious need of an accommodation in the manner that he was arrested, handcuffed, and transported and that the SROs failed to reasonably accommodate him.  *See Robertson*, 500 F.3d at 1197 ("When a disabled individual's need for an accommodation is obvious, the individual's failure to expressly 'request' one is not fatal to the ADA claim").

Accordingly, the Court denies this portion of the DCSO Defendants' Motion.

3.     Entitlement to Compensatory Damages

In the Complaint, Plaintiff seeks, *inter alia*, "compensatory damages from the [District], the Sheriff, and SROs sued in their individual capacities."  (ECF No. 1 at 24.)

To recover compensatory damages under Title II of the ADA, courts generally require a showing of intentional discrimination.  *See Powers v. MJB Acquisition Corp.*, 184 F.3d 1147, 1153 (10th Cir. 1999).  Intentional discrimination does not require a showing of personal ill will or animosity toward the disabled person; rather, "intentional discrimination can be inferred from a defendant's deliberate indifference to the strong likelihood that pursuit of its questioned policies will likely result in a violation of federally protected rights."  *Id.*

The test for deliberate indifference in the context of intentional discrimination comprises two prongs: (1) "knowledge that a harm to a federally protected right is substantially likely," and (2) "a failure to act upon that . . . likelihood."  *See Barber ex rel. Barber v. Colo. Dep't of Rev.*, 562 F.3d 1222, 1229 (10th Cir. 2009).  The failure to act must be "more than negligent" and involve "an element of deliberateness."  *Id.* at 1228. When the alleged failure to act is an alleged failure to train, a plaintiff must demonstrate "that the defendant was on notice of the need for more or better training."  *J.V.*, 813 F.3d at 1298 (internal quotation marks omitted).

        a.    *Whether Plaintiff Has Plausibly Alleged Deliberate Indifference by the SROs[4]*

The DCSO Defendants argue that the "Complaint falls short of pleading facts evidencing deliberate indifference by the [SROs]."  (ECF No. 23 at 12.)  They further contend that "the law in the Tenth Circuit at the time of Plaintiff's arrest would not have put the [SROs] on notice that their conduct was likely to violate his federally protected

---

[4] The Court notes that Plaintiff has not brought his ADA or Rehabilitation Act claims against the SROs.  (*See* ¶¶ 128–49.)  Nonetheless, an analysis regarding whether Plaintiff has plausibly alleged deliberate indifference by the SROs is a necessary component of the question of the availability to Plaintiff of a vicarious liability claim against DCSO.

rights" and that "Plaintiff's allegations do not evidence the type of deliberate conduct that could be construed as deliberate indifference to his rights."  (*Id.* at 12–13.)  The Court disagrees.

As explained in Part III.A.2, Plaintiff has plausibly alleged that the SROs were informed by various individuals that Plaintiff has emotional disabilities and a history of self-harm, and witnessed Plaintiff banging his head against the plexiglass (¶¶ 59–70); despite plausible allegations demonstrating that the SROs were aware that Plaintiff may have needed an accommodation, the SROs failed to act upon that knowledge.[5]  The Court concludes that Plaintiff's allegations are sufficient to plausibly allege that the DCSO Defendants acted with deliberate indifference to his federally-protected rights.

Accordingly, the Court denies this portion of the DCSO Defendants' Motion.

      b.    *Availability of Compensatory Damages Against DCSO Under a Vicarious Liability Theory*

The DCSO Defendants further argue that Plaintiff has failed to allege facts evidencing deliberate indifference by DCSO as an entity and that "Plaintiff's allegations incorrectly assume that a public entity can be vicariously liable for damages under Title II if the *officers'* conduct was deliberately indifferent."  (ECF No. 23 at 8 (emphasis in original).)  For support, they cite various non-binding cases in which courts have noted the similarities between Title VI, Title IX, and Title II and have concluded that vicarious liability is unavailable under the ADA and Rehabilitation Act.  (*Id.* at 9–10 (citing *Liese v. Indian River Cnty. Hosp. Dist.*, 701 F.3d 334, 345–47 (11th Cir. 2012); *Arthur v. D.C. Housing Auth.*, 2020 WL 182111, at *11 (D.D.C. Apr. 11, 2020); and *Hooper v. City of*

---

[5] Although the DCSO Defendants attempt to import a "clearly established law" analysis into the deliberate indifference standard under the ADA, they cite no law supporting their proposition.  (ECF No. 23 at 12–13.)  Nor is the Court aware of any such law.

*St. Paul*, 2019 WL 4015443, at *9 (D. Minn. Aug. 26, 2019)).)  They further cite *Gebser v. Lago Vista Independent School District*, 524 U.S. 274 (1998) for the proposition that Title VI does not allow vicarious liability claims against employers for the acts of their employees.  (*Id.* at 9.)

In response, Plaintiff argues that "the Fourth, Fifth, Ninth Circuits . . . have unanimously held that a municipal employer is vicariously liable for the acts of its employees who violate Title II of the ADA."  (ECF No. 47 at 11 (citing cases).)

Absent any binding authority to the contrary from within the Tenth Circuit, the Court will follow the guidance from the other circuit courts which have concluded that Title II of the ADA provides for *respondeat superior* liability.  Accordingly, this portion of the DCSO Defendants' Motion is denied.

c.      *Availability of Compensatory Damages against DCSO on a Direct Liability (Failure to Train) Theory*

Although the Tenth Circuit has "not recognized a failure-to-train claim of discrimination under the ADA, . . . [it] ha[s] not foreclosed the possibility."  *J.V.*, 813 F.3d at 1297; *see Gohier*, 186 F.3d at 1222 (noting that "Gohier might have argued that Title II required Colorado Springs to better train its police officers to recognize reported disturbances that are likely to involve persons with mental disabilities, and to investigate and arrest such persons in a manner reasonably accommodating their disability" but declining to recognize such a claim); *Sperry v. Maes*, 592 F. App'x. 688, 698 (10th Cir. 2014) ("[W]e do not have to determine whether such a [failure to train ADA] claim exists because, even assuming it does, [plaintiff] has not demonstrated the 'deliberate indifference' required to prove a failure-to-train claim by showing that the Town of Castle Rock was 'on notice' of the need for 'more or different training'"), *cert. denied*, 577 U.S.

832 (2015).  By contrast, the District of Colorado has recognized a failure to train claim under the ADA.  *See, e.g.*, *Partridge v. Smith*, 2020 WL 897653, at *12 (D. Colo. Feb. 25, 2020); *Buben v. City of Lone Tree*, 2010 WL 3894185, at *12 (D. Colo. Sept. 30, 2010).  The Court will assume for purposes of the Order that Plaintiff may assert an ADA claim for failure to train against DCSO.

The DCSO Defendants argue, even assuming a failure to train claim exists under the ADA, that Plaintiff has not pled facts establishing DCSO's direct liability.  (ECF No. 23 at 10 ("The Complaint is devoid of facts evidencing that any member of DCSO's command staff with the authority to implement corrective measures had knowledge of, and was deliberately indifferent to, any putative discrimination by its deputies in effectuating arrests of students with disabilities at the time of Plaintiff's arrest.").)  According to the DCSO Defendants, Plaintiff has failed to allege facts  "evidencing notice to anyone at DCSO with authority to restructure its training program that the existing training program was deficient" or "specific involvement in the arrest by DCSO or any facts evidencing an ADA or Rehabilitation Act violation by a DCSO employee."  (*Id.* at 10–11.)  Moreover, they contend that Plaintiff's allegations regarding published statistics and news stories do not demonstrate how DCSO was alerted to deficiencies in any particular aspect of its own training program or what alternative training should have been provided.  (*Id.* at 11.)

However, in the Complaint, Plaintiff alleges that notwithstanding DCSO policies stating that all officers are trained in recognizing mental health and related disorders, "in reality, SROs receive little or no training on interacting with students with disabilities, how to approach such students, how to de-escalate such students, how to keep these

students safe, or when to seek medical attention for such students."  (¶ 87; *see also* ¶ 89 ("[T]he 2019–2020 school year was the first year that SROs were assigned specifically to Douglas County middle schools, and despite this, neither the [ ] District nor the DCSO provided training to SROs in interacting with middle-school aged children with disabilities.").)

Plaintiff further cites a number of statistics and incidents surrounding restraints used on students with disabilities both within the District and around the country (*see* ¶¶ 103–08, 112–20) and contends that the District and DCSO were "aware or should have been aware, based on their own statistical data and specific incidents, that their present training for school staff—including SROs—posed a risk that students' rights would be violated, and that further training regarding interacting with students with disabilities was needed to prevent or reduce that risk."  (¶ 109.)

Assuming the truth of Plaintiff's well-pleaded factual allegations and viewing them in the light most favorable to Plaintiff, the Court concludes that Plaintiff has plausibly stated a failure to train claim under the ADA against DCSO.  Although DCSO argues that Plaintiff's allegations do not demonstrate that anyone at DCSO with authority to restructure its training program was on notice, and was deliberately indifferent to, the deficiencies of its training program, the Court concludes that such arguments are better suited for a motion for summary judgment after the close of discovery.

Accordingly, the Court denies this portion of the DCSO Defendants' Motion.

**B.   Fourth Amendment Excessive Force Claim Against the SROs**

1.   Qualified Immunity Standard

"Individual defendants named in a § 1983 action may raise a defense of qualified immunity, which shields public officials . . . from damages actions unless their conduct

was unreasonable in light of clearly established law."  *Gutierrez v. Cobos*, 841 F.3d 895, 899 (10th Cir. 2016) (internal quotation marks omitted).  "Once the qualified immunity defense is asserted," as the Defendants have done here, "the plaintiff bears a heavy two-part burden to show, first, the defendant[s'] actions violated a constitutional or statutory right, and second, that the right was clearly established at the time of the conduct at issue."  *Thomas v. Kaven*, 765 F.3d 1183, 1194 (10th Cir. 2014) (internal quotation marks omitted).  "If the plaintiff fails to satisfy either part of the inquiry, the court must grant qualified immunity."  *Carabajal v. City of Cheyenne*, 847 F.3d 1203, 1208 (10th Cir. 2017), *cert. denied*, 138 S. Ct. 211 (2017).  "The judges of the district courts . . . [may] exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."  *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).  A plaintiff must make this demonstration "on the facts alleged."  *Riggins v. Goodman*, 572 F.3d 1101, 1107 (10th Cir. 2009).

"In this circuit, to show that a right is clearly established, the plaintiff must point to a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains."  *Gutierrez*, 841 F.3d at 900 (internal quotation marks omitted).  "A plaintiff need not show the very act in question previously was held unlawful in order to establish an absence of qualified immunity."  *Id*. (internal quotation marks omitted).  But "[a]n officer cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in his shoes would have understood that he was violating it."  *City and Cnty. of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1774

(2015) (internal quotation marks omitted).

"The dispositive question is 'whether the violative nature of *particular* conduct is clearly established.'" *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (emphasis in original) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)).  Therefore, a plaintiff may not defeat qualified immunity "simply by alleging violation of extremely abstract rights." *White v. Pauly*, 137 S. Ct. 548, 552 (2017).  Nonetheless, the clearly established inquiry "involves more than a scavenger hunt for prior cases with precisely the same facts.  The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation." *Perea v. Baca,* 817 F.3d 1198, 1204 (10th Cir. 2016) (internal quotation marks and citation omitted).

> 2.    Whether Plaintiff Has Pled a Fourth Amendment Violation

In the Complaint, Plaintiff alleges that "SROs Nicholson, Peterson, and Coyle used excessive force in seizing [Plaintiff] [in] violation of [Plaintiff's] Fourth Amendment rights by handcuffing [Plaintiff] unduly aggressively and then forcing him to remain handcuffed and restrained for an excessively lengthy period of time."  (¶ 152.)  Plaintiff further contends that "[a]s a proximate result of all Defendants' actions and inactions, [he] suffered physically and emotionally, and continues to experience fear, distrust, and anxiety  regarding law enforcement officers."  (¶ 157.)

"The Fourth Amendment forbids unreasonable seizures, including the use of excessive force in making an arrest." *Casey v. City of Federal Heights*, 509 F.3d 1278, 1281 (10th Cir. 2007).  Claims of excessive force are analyzed under the objective reasonableness standard of the Fourth Amendment. *See, e.g., Graham v. Connor*, 490 U.S. 386, 395 (1989).  This standard "requires inquiry into the factual circumstances of

every case; relevant factors include the crime's severity, the potential threat posed by the suspect to the officer's and others' safety, and the suspect's attempts to resist or evade arrest." *Medina v. Cram*, 252 F.3d 1124, 1131 (10th Cir. 2001) (citing *Graham*, 490 U.S. at 396). A "court assesses the reasonableness of an officer's conduct from the perspective of a reasonable officer on the scene, acknowledging that the officer may be forced to make split-second judgments in certain difficult circumstances." *Marquez v. City of Albuquerque*, 399 F.3d 1216, 1220 (10th Cir. 2005) (quoting *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1314 (10th Cir. 2002) (further citation omitted)); *Graham*, 490 U.S. at 396 (recognizing that a law-enforcement officer's "right to make an arrest . . . necessarily carries with it the right to use some degree of physical coercion . . . to effect it").

Moreover, the Tenth Circuit has recognized that excessive force claims involving the use of handcuffs require a showing of an "actual, non-de minimis physical, emotional, or dignitary injury." *A.M. v. Holmes*, 830 F.3d 1123, 1151–52 (10th Cir. 2016) (quoting *Fisher v. City of Las Cruces*, 584 F.3d 888, 899 (10th Cir. 2009)); *see also Cortez v. McCauley*, 478 F.3d 1108, 1129 (10th Cir. 2007) (en banc) ("We believe that a claim of excessive force requires some actual injury that is not de minimis, be it physical or emotional."). This is because "[h]andcuffing claims, in essence, concern the manner or course in which a petitioner is handcuffed," and "[b]ecause handcuffing itself is not necessarily an excessive use of force in connection with an arrest." *Fisher*, 584 F.3d at 897.

The DCSO Defendants argue that Plaintiff has failed to allege a non-de minimis injury caused by the handcuffs used in his case. (ECF No. 23 at 17–18.) In response,

Plaintiff points out that he had a headache and a 5-centimeter hematoma on his forehead from banging his head, had swollen writs from the handcuffs, participated in the Day Treatment program at Children's Hospital following this incident, and "demonstrates fear, distrust, and anxiety when interacting with law enforcement officers."  (ECF No. 47 at 23 (citing ¶¶ 80–84, 137, 148, 157).)

After carefully considering Plaintiff's allegations regarding his physical injuries, as presently alleged, the Court concludes that Plaintiff has failed to adequately allege a constitutional violation that passes muster under current Tenth Circuit precedent.  After all, the Tenth Circuit has repeatedly rejected "minor, temporary injuries—like pain, numbness, or swelling—as de minimis in handcuff-related excessive-force cases." *Scott*, 711 F. App'x at 881 (concluding plaintiff's injuries were "not severe enough to render [officer's] force excessive" notwithstanding swelling and bruises that lasted about a week); *Koch v. City of Del City*, 660 F.3d 1228, 1247–48 (10th Cir. 2011) (concluding plaintiff had failed to show "actual injury" when hospital records and photographs show that wrist and arm injuries were superficial abrasions); *cf. Vondrak v. City of Las Cruces*, 535 F.3d 1198, 1209–10 (10th Cir. 2008) (concluding that a plaintiff established a constitutional violation when tightened handcuffs caused permanent nerve damage in plaintiff's wrist).  Here, while Plaintiff has alleged that he suffered physical injuries, they do not rise beyond the level of "minor, temporary injuries."  *Scott*, 711 F. App'x at 881.

Nor can the Court conclude that Plaintiff's allegations surrounding his emotional injuries plausibly state an excessive force claim.  While an excessive force claim "may stand on an emotional injury like humiliation . . . in the context of an arrest, the alleged humiliation must be more harmful than that which accompanies the typical custodial

arrest."  *Id.* at 882 ("Though Scott was surely humiliated when his peers saw him walking through the hallways in handcuffs, a public arrest does not violate the Fourth Amendment simply because it is embarrassing.").  Similarly, Plaintiff's allegations that he subsequently participated in a Day Treatment program at Children's Hospital following this incident and now "demonstrates fear, distrust, and anxiety when interacting with law enforcement officers" lack specificity regarding the severity of his emotional injuries.  As such, the Court cannot conclude that Plaintiff has plausibly alleged that he has suffered a lasting, non-de minimis emotional injury.[6]

The Court therefore concludes that Plaintiff has failed to plausibly state a Fourth Amendment excessive force claim against Peterson, Nicholson, and Coyle.  As such, because Plaintiff has failed to overcome their qualified immunity defense, the Court dismisses this claim against Peterson, Nicholson, and Coyle without prejudice.[7]

Nonetheless, because it is possible that Plaintiff will be able to plausibly allege that he suffered lasting, non-de minimis injuries and meet the high bar set by the Tenth Circuit, the Court will grant Plaintiff leave to file an amended complaint containing

---

[6] Although Plaintiff cites *Maresca v. Bernalillo County*, 804 F.3d 1301 (10th Cir. 2015) for the proposition that plaintiffs can exceed the de minimis requirement with evidence of psychological and emotional injury, the emotional injuries sustained in *Maresca* are readily distinguishable from the present case.  In *Maresca*, plaintiffs were ordered out of a truck at gunpoint and handcuffed; thereafter, the nine-year-old plaintiff present at the scene was diagnosed with post-traumatic stress disorder and there was *specific* evidence regarding the plaintiff children's subsequent night terrors and emotional episodes.  *Id.* at 1315 n.7.  Here, by contrast, Plaintiff has alleged only generalized "fear, distrust, and anxiety," which the Court cannot conclude exceeds the de minimis injury requirement.

[7] Because the Court dismisses Plaintiff's Fourth Amendment excessive force claims, the Court need not address the DCSO Defendants' arguments regarding the *Graham* factors and the lack of Defendant Coyle's individual participation in the alleged constitutional violation. (ECF No. 23 at 14–18.)

additional allegations surrounding Plaintiff's injuries.[8]   Moreover, because the Court is dismissing Plaintiff's Fourth Amendment claim on this basis, it need not at this juncture decide whether the constitutional right Plaintiff contends was violated by the SROs' conduct was clearly established.

## C.   Excessive Force Claim against DCSO

As explained in Part III.B.2, Plaintiff has not plausibly alleged an excessive force claim against the SROs.  For the same reasons, the Court finds that Plaintiff has not plausibly alleged an excessive force claim against DCSO.  *See Trigalet v. City of Tulsa, Okla.*, 239 F.3d 1150, 1155–56 (10th Cir. 2001) ("even if it could be said that Tulsa's policies, training, and supervision were unconstitutional, the City cannot be held liable where, as here, the officers did not commit a constitutional violation").[9]

Accordingly, the Court grants this portion of the DCSO Defendants' Motion and dismisses the Fourth Amendment excessive force claim against DCSO without prejudice.

---

[8] In the event an amended complaint with an augmented Fourth Amendment claim is filed and responded to with a defense motion under Rule 12 or 56, the parties are directed to include in the briefing on such a motion a detailed discussion of whether the requisite showing of the scope, extent, or degree of the non-de minimis injuries required to get the claim to a jury is, or should be, less onerous when plaintiff is a minor at the time the alleged injuries were sustained.

[9] Plaintiff cites *Crowson v. Washington County State of Utah*, 983 F.3d 1166, 1191 (10th Cir. 2020), *cert. denied sub nom. Washington County v. Crowson*, 142 S. Ct. 224 (2021), for the proposition that a municipality can be held liable even when a court determines that individual defendants did not violate the United States Constitution.  While it is true that the "sum of multiple officers' actions taken pursuant to municipal policy" may result in a constitutional liability even if no single municipal officer violated an individual's constitutional rights, *see id.*, this situation is not applicable here as the SROs are alleged to have engaged in substantially similar conduct that, taken either together or separately, does not rise to the level of a constitutional violation.

## IV. THE DISTRICT'S MOTION TO DISMISS

**A.     ADA and Rehabilitation Act Claims**

    1.     <u>Liability Against the District Under a Joint Employment Theory</u>

The District argues that "the Sheriff is the *only* employer of Nicholson, Peterson, and Coyle, and as a matter of law, the District cannot be their joint employer" and that "Colorado law does not allow [Plaintiff']s joint employment theory."  (ECF No. 28 at 5–6.) For support, the District cites *Bristol v. Board of County Commissioners of County of Clear Creek*, in which the Tenth Circuit gave *en banc* rehearing to determine whether a board of county commissioners owed a duty to provide accommodation to an employee of the county sheriff under the ADA.  312 F.3d 1213, 1215 (10th Cir. 2002).  In *Bristol*, the Tenth Circuit recognized that "[c]ourts applying the joint-employer test treat independent entities as joint employers if the entities 'share or co-determine those matters governing the essential terms and conditions of employment.'"  *Id.* at 1218 (quoting *Virgo v. Rivera Beach Assocs., Ltd.*, 30 F.3d 1350, 1360 (11th Cir. 1994)).  "In other words, courts look to whether both entities 'exercise significant control over the same employees.'"  *Id.* (quoting *Graves v. Lowery,* 117 F.3d 723, 727 (3d Cir. 1997)). After considering the facts of the case, the Tenth Circuit concluded that "because under Colorado law a [b]oard lacks the power to control the hiring, termination, or supervision of a [s]heriff's employees, or otherwise control the terms and conditions of their employment, there can be no basis upon which a jury could determine that the [b]oard owes such a duty [under the ADA]."  *Id.* at 1215.

Moreover, the District argues that Plaintiff has not pled factual allegations demonstrating that the District had *de facto* control over Nicholson, Peterson, and Coyle.  (ECF No. 28 at 6 (arguing there are "no allegations that suggest when or how an

employment relationship was formed between the Defendants" or demonstrating the

District's authority over Sheriff's employees).)  The District further cites the

Intergovernmental Agreement between the District and Board of County Commissioners

"regarding the sharing of costs for providing Deputy Sheriffs to act as school resource

officers" (the "Intergovernmental Agreement"), which provides in relevant part:

> PERSONNEL & SUPERVISION: Any member of the
> Sheriff's Office assigned to fulfill any services provided
> through this contract shall remain under control of the
> Sheriff's Office and shall be afforded the same employment
> rights and benefits as other office members.  The SROs and
> [Youth Education and School Safety ("YESS")] Officer are
> subject to the Douglas County Sheriff's chain of command
> and to the policies, procedures, rules, regulations, directives,
> and orders of the Sheriff and the County.  The SROs will
> also comply with the laws, policies, and regulations of the
> District to the extent that such measures are not in conflict
> with those of the County or Sheriff.  Although the SROs and
> YESS Officer will work closely with school administrators
> and faculty to determine the most effective use of the
> officers' time and expertise, they shall not be subject to
> supervision or direction by the District.

(ECF No. 29 § 7.)[10]

In response, Plaintiff argues that *Bristol* does not apply to alleged violations of

Title II of the ADA and instead argues that the ADA "prohibits discrimination when it is

either direct or committed 'through contractual, licensing, or other arrangements.'"

*Marks v. Colo. Dep't of Corr.*, 976 F.3d 1087, 1096 (10th Cir. 2020) (quoting 28 C.F.R. §

---

[10] The District argues that the Court may consider this document without converting the District's Motion to Dismiss into a motion for summary judgment because the contract is implicitly referenced in the Complaint and is central to Plaintiff's claims.  (ECF No. 28 at 7 (citing *GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381 (10th Cir. 1997)).)  Plaintiff "agrees with the [District] that this Court should consider the Contract without converting the [ ] District's motion to dismiss into one for summary judgment."  (ECF No. 53 at 1 n.1.)  The Court agrees.  Therefore, the Court will consider the Intergovernmental Agreement without converting the District's Motion to Dismiss into a motion for summary judgment.

35.130(b)) (concluding that a reasonable factfinder could conclude that a community corrections program was a program of the Colorado Department of Corrections and Colorado Department of Criminal Justice based on a variety of facts).  According to Plaintiff, "any reasonable factfinder will regard the SROs program as the [ ] District" as "[t]he [ ] District provides funding for SROs' salaries, benefits, and training and refers students to the SROs."  (ECF No. 53 at 5–6.)

Ultimately, the Court need not determine at this juncture whether *Bristol* or *Marks* applies because Plaintiff has failed in his current complaint to plausibly allege non-conclusory facts demonstrating that the District jointly employs Nicholson, Peterson, and Coyle.  To be sure, Plaintiff alleges that "[t]he SROs were . . . agents of both [DCSO] and the District," they "split the cost of the SRO's salaries and benefits, and . . . paid for costs of SRO training" (¶ 86), and District officials sometimes contacted the SROs regarding incidents (¶¶ 34, 105).  However, these thin allegations do not plausibly demonstrate that the District controlled or directed the SROs such that the District could be considered their joint employer, particularly in light of the Intergovernmental Agreement's provision that "SROs shall not be subject to supervision or direction by the District."  (ECF No. 29 at § 7.)

Accordingly, the Court concludes that Plaintiff has failed to plausibly allege that the District jointly employs Nicholson, Peterson, and Coyle, such that it may be held liable under a joint employment theory under the ADA and Rehabilitation Act.  The Court therefore grants this portion of the District's Motion and dismisses the ADA and Rehabilitation Act claims against the District without prejudice.

2.    Direct Liability Against the District Based on Mr. D'Ardenne and Dr. Smrcka's Failure to Reasonably Accommodate Plaintiff During His Arrest

Plaintiff argues that "[i]n addition to being liable for acts of SROs, the [ ] District is liable for the principal and school psychologist failing to reasonably accommodate [him] during arrest" by not stopping the SROs from handcuffing him, by failing to move him so he did not bang his head, and by failing to get him medical attention.  (ECF No. 53 at 9.)

However, after carefully reviewing Plaintiff's allegations, the Court cannot conclude that Plaintiff has plausibly alleged that there was an obvious need for Mr. D'Ardenne or Dr. Smrcka to further accommodate Plaintiff during his arrest.  As the District points out, "D'Ardenne accommodated [Plaintiff] by allegedly calling his parents, informing the SROs of [Plaintiff's] 'serious emotional disabilities' and otherwise taking steps to help prevent [Plaintiff] from becoming re-escalated" and that Dr. Smrcka accommodated Plaintiff by sitting with him after the incident.  (ECF No. 60 at 10.)

Critically, Plaintiff does not cite any case law supporting his argument that school personnel may face legal liability for failing to intervene in an arrest (or have a duty to intervene) (*see* ECF 53 at 9–10), and the Court is unaware of any such law.

Accordingly, the Court dismisses Plaintiff's ADA and Rehabilitation Act claims against the District without prejudice to the extent the claims are predicated on Principal D'Ardenne or Dr. Smrcka's alleged failure to accommodate Plaintiff.

**B.    Fourth Amendment Claims**

The District argues that Plaintiff's Fourth Amendment claim against the District must be dismissed because the Complaint fails to establish that the SROs violated Plaintiff's constitutional rights against an application of excessive force.  (ECF No. 28 at 11.)

As explained in Part III.B.2, Plaintiff has not plausibly alleged an excessive force claim against the DCSO Defendants.  Because Plaintiff has failed to establish that the SROs violated Plaintiff's Fourth Amendment rights, the Court concludes that Plaintiff has also failed to plausibly allege an excessive force claim against the District.

Accordingly, the Court grants this portion of the District's Motion and dismisses the Fourth Amendment excessive force claim against the District without prejudice.

## V. OBJECTIONS TO THE ORDER DENYING MOTION TO STAY

In the Order Denying Motion to Stay, Judge Crews rejected the DCSO Defendants' request for a complete stay of discovery pending the outcome of the various motions to dismiss filed in this action.  (ECF No. 62.)  In their Objections, the DCSO Defendants argue that Judge Crews clearly erred: (1) in his assessment that the SROs' assertion of qualified immunity in a motion to dismiss raises evidentiary issues; (2) in his analysis of the *String Cheese* factors in determining the propriety of a stay for the SROs; and (3) in his failure to analyze DCSO's interests in a complete stay in light of the Defendants' entitlement to a stay based on their assertion of qualified immunity at this stage of the proceedings.  (ECF No. 63 at 2.)  Accordingly, the DCSO Defendants ask the Court to sustain their Objections and grant their Motion to Stay.  (*Id.* at 12.)

However, because the Court has now ruled on the DCSO Defendants' Motion to Dismiss, there is no continuing need to stay discovery.  Accordingly, the DCSO Defendants' Objections are overruled as moot, and the Court affirms Judge Crews's Order Denying Motion to Stay.

## VI. CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1.      The DCSO Defendants' Motion to Dismiss (ECF No. 23) is GRANTED IN PART and DENIED IN PART as set forth herein;

2.      Defendant Douglas County School District RE-1's Motion to Dismiss (ECF No. 28) is GRANTED;

3.      Plaintiff's Americans with Disabilities Act and Rehabilitation Act claims against Douglas County School District RE-1 are DISMISSED WITHOUT PREJUDICE;

4.      Plaintiff's Fourth Amendment excessive force claim is DISMISSED WITHOUT PREJUDICE;

5.      The DCSO Defendants' Objections to Magistrate [Judge]'s Order Re: Motion to Stay [Doc. 62] (ECF No. 63) are OVERRULED as MOOT;

6.      Judge Crew's October 26, 2021 Order Re: Motion to Stay [Dkt. 24] (ECF No. 62) is AFFIRMED; and

7.      Plaintiff is granted leave to file an Amended Complaint that addresses the pleading deficiencies discussed in this Order on or before **March 18, 2022**.

Dated this 18th day of February, 2022.

BY THE COURT:

William J. Martinez
United States District Judge