**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:21-cv-00704-WJM-SKC

A.V., a child, through his mother and next friend, MICHELLE HANSON;

     Plaintiff,

v.

DOUGLAS COUNTY SCHOOL DISTRICT RE-1;
TONY SPURLOCK, the Douglas County Sheriff, in his official capacity;
SIDNEY NICHOLSON, a Douglas County School Resource Officer, in his individual capacity;
LYLE PETERSON, a Douglas County School Resource Officer, in his individual capacity;
DANIEL COYLE, a Douglas County School Resource Officer, in his individual capacity,

     Defendants.

---

**FIRST AMENDED COMPLAINT AND JURY DEMAND**

---

     Plaintiff A.V., a child, through his mother and next friend, Michelle Hanson, by and through counsel, Jack Robinson of SPIES, POWERS & ROBINSON, P.C., and Mark Silverstein, Sara R. Neel, Arielle Herzberg, and Asma Kadri Keeler of the AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF COLORADO, respectfully alleges for his First Amended Complaint and Jury Demand as follows:

## INTRODUCTION

     1.     On August 29, 2019, School Resource Officers ("SROs") in police uniforms entered Sagewood Middle School and aggressively handcuffed A.V., an eleven-year-old child with autism.  They dragged the handcuffed child through the hallways of his school, placed him in a patrol car, and left him there for hours, while, still handcuffed, he banged his head repeatedly against the plexiglass of the patrol car and cried in pain.

1

2.      That morning, A.V. had faced disability-related challenges when a classmate wrote on him with markers.  A.V. is sensitive to touch.  He became escalated and poked his classmate with a pencil.  A.V. then calmed down and sat quietly with the school psychologist, but rather than allowing the de-escalation process to continue and having accommodations implemented through school staff intervention, the principal chose to call in the SROs to intervene in a law enforcement capacity.  Although A.V. had been sitting calmly, the SROs interrupted the de-escalation process and arrested A.V.

3.      A.V.'s stepfather rushed to the school and asked to see A.V., but the SROs and school officials would not allow him to see A.V.  A.V's stepfather asked the officers to take A.V. to get medical attention, but they refused.

4.      Instead, after A.V. was left handcuffed for hours, an SRO drove A.V. to a juvenile detention center and placed A.V. in custody on charges of assault, harassment, and resisting arrest.  A.V. remained in custody until his parents were able to post a $25,000 bond.  The charges against A.V. have since been dropped.

5.      A.V. has suffered physically and emotionally as a result of the Defendants' violations of his rights.

6.      The officers involved in this traumatic handcuffing and arrest of A.V. were School Resource Officers ("SROs").  They are Douglas County Sheriff's deputies whom the Douglas County School District specially hired to serve in its schools.  The SROs in this case had been specifically assigned to middle schools for the first time that year without adequate training on interacting with students with disabilities.

7.     School district officials also did not receive adequate training on when it was appropriate to call for SRO assistance and what accommodations needed to be fully provided to students with disabilities before SROs were called in or arrested those students.

8.     No SRO or school personnel were disciplined due to the incident, and in fact, one of the SROs, SRO Nicholson, was commended for his handling of the situation.  He was deemed to have completed the SRO field training program and recommended to be moved to solo status just a few days after the incident.  Only a few months after handcuffing A.V, SRO Nicholson repeated his behavior: he handcuffed a twelve-year-old child with disabilities after that child became escalated in school.  As with A.V., he left that child handcuffed for hours.

## JURISDICTION AND VENUE

9.     This action arises under the Constitution and laws of the United States, pursuant to 42 U.S.C. § 1983; the Americans with Disabilities Act, 42 U.S.C. § 12131; and the Rehabilitation Act, 29 U.S.C. § 794.  This Court has jurisdiction pursuant to 28 U.S.C. § 1331.

10.     Venue is proper pursuant to 28 U.S.C. § 1391.  All parties reside within the District of Colorado, and the events described in this Complaint occurred in the District of Colorado.

## PARTIES

11.     Plaintiff A.V. is a minor child who, at the time of the incident, was an eleven-year-old student at Sagewood Middle School, a public school in the Douglas County School District.  Michelle Hanson is the mother of A.V.  Plaintiff A.V. and his mother and next friend, Michelle Hanson, are residents of Douglas County, Colorado.

12.     Defendant Douglas County School District RE-1 ("School District") is a political subdivision of the state of Colorado.

13.     At all times relevant to this Complaint, Defendant Tony Spurlock was the Douglas County Sheriff ("Sheriff").  He had final policymaking authority for the Douglas County Sheriff's Office ("Sheriff's Office" or "DCSO").  The Sheriff is the official responsible for ensuring that the Sheriff's Office and its employees comply with the Constitution, as well as federal and state law.  He is sued in his official capacity.

14.     At all times relevant to this Complaint, Defendant Sidney Nicholson, also known as Chance Nicholson ("SRO Nicholson" or "Nicholson"), Defendant Lyle Peterson ("SRO Peterson" or "Peterson"), and Defendant Daniel Coyle ("SRO Coyle" or "Coyle") (collectively, "Defendant SROs") were employed as SROs.  Each SRO is sued in his individual capacity.

15.     At all times relevant to this Complaint, Defendants were acting or failing to act under color of state law.

## FACTUAL ALLEGATIONS

16.     At the time of the incident described in this Complaint, A.V. was an eleven-year-old boy and a sixth-grade student at Sagewood Middle School.

17.     A.V. is a beloved son, fun brother, protective friend, and enthusiastic student.

18.     He is caring and has a great sense of humor and he loves video games, electronics, cat videos, and his family.

19.     At the time of the incident, A.V. had also been diagnosed with Autism Spectrum Disorder ("autism") and a serious emotional disability.

20.     A.V.'s disabilities cause him to avoid some sensory stimuli and to be triggered by touch and loud sounds.  A.V.'s disability also cause him to have difficulty managing his response to frustration, expressing emotions, wants, and needs, and handling some transitions.

21.     A.V. is an individual with disabilities within the meaning of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794(a), and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*

22.     In a recent school year, 11.9% of enrolled students in Sagewood Middle School, and 13.1% of students in the Douglas County School District more generally, have been students with disabilities.[1]

23.     A.V. is Hispanic.  In a recent school year, the student body of Sagewood Middle School has been composed of a large majority of white students, with Hispanic students comprising 11.9% of the school.[2]

### The Argument Between A.V. and his Classmate

24.     On August 29, 2019, in the third week of the 2019-2020 school year, A.V. was in an elective class called Family and Consumer Services when he experienced disability-related behavioral challenges.

25.     These challenges manifested when A.V.'s classmate, D.H., wrote on A.V. with a marker, triggering A.V. to become escalated because he is sensitive to touch.

---

[1] Civil Rights Data Collection, *Sagewood Middle School,* https://ocrdata.ed.gov/profile/9/school/225790/summary; Civil Rights Data Collection, *Douglas County School District,* https://ocrdata.ed.gov/profile/9/district/27848/summary.
[2] Civil Rights Data Collection, *Sagewood Middle School,* https://ocrdata.ed.gov/profile/9/school/225790/summary.

26.     A.V. poked D.H. with a pencil, causing D.H. to have small cut on his arm.   A picture of D.H.'s cut is copied here.



27.     D.H. said that the cut did not hurt.

28.     Shortly after this happened, a classroom aide texted school administrators that she needed help with A.V.

29.     In response, the Dean of Students and the Principal—Dr. Christine Funk and Ben D'Ardenne—reported to the classroom.

30.     Dr. Funk and Principal D'Ardenne requested that A.V. leave the classroom.  A.V. complied.

31.     Dr. Funk and Principal D'Ardenne alleged that A.V. pushed past them as he was leaving.  No school staff reported that any physical contact hurt.

### A.V. Calms Down with the School Psychologist

32.     After A.V. left the classroom, A.V. sat down in the Mountain Lion Pod—an open area of the school between classrooms.

33.     Dr. Smrcka, the school psychologist, came to the pod after a few minutes.

34.     A.V. de-escalated while listening to special sensory music through his headphones, and he sat quietly with Dr. Smrcka.

35.     Dr. Smarcka knew that A.V. had autism.  He knew that anytime A.V. became dysregulated, A.V. required specific and common-sense accommodations, such as time and space and nobody touching him or entering his personal space.

### SRO Nicholson and Peterson Arrive

36.     After A.V. left the classroom, Principal D'Ardenne texted the SRO assigned to Sagewood Middle School, SRO Nicholson, that he needed him to help due to the incident between A.V. and his classmate.

37.     Soon after, as A.V. was sitting calmly with the school psychologist, SRO Nicholson, along with SRO Peterson, arrived at Sagewood Middle School in response to Principal D'Ardenne's text.

38.     Principal D'Ardenne greeted Nicholson and Peterson.   Principal D'Ardenne explained that D.H. asked A.V. to stop doing something in class, and A.V. responded by what the Principal characterized as "stabbing" D.H. with a pencil.

39.     Principal D'Ardenne told Nicholson and Peterson that the school had called A.V.'s parents.

40.     Principal D'Ardenne also told the SROs that A.V. had serious emotional disabilities.  He further explained that A.V. was currently in the Mountain Lion Pod with Dr. Smrcka, the school psychologist, and that A.V. had calmed down.

41.     Principal D'Ardenne said that he was worried that A.V. may become re-escalated, so he suggested that he try to move A.V. first before the SROs got involved.

42.     SRO Nicholson responded by instead proposing that he ask A.V. to come talk to him in the SRO office and said: "if he wants to come, that's fine; if he doesn't, that's fine too." Principal D'Ardenne agreed to that plan.

**SRO Nicholson and Peterson Aggressively Handcuff A.V.**

43.     Principal D'Ardenne brought SROs Nicholson and Peterson to the Mountain Lion Pod, where A.V. was sitting calmly with Dr. Smrcka.

44.     Principal D'Ardenne knew that A.V. had autism.  He knew that anytime A.V. became dysregulated, he required specific and common-sense accommodations such as time and space and nobody touching him or entering his personal space.  Nevertheless, Principal D'Ardenne interrupted the de-escalation process to bring the SROs in and allowed the SROs to question A.V.

45.     SRO Nicholson asked A.V. to come talk in the SRO's office in the school.  A.V. shook his head no.

46.     Dr. Smrcka explained to the officers that A.V. was not highly verbal and that he tends not to talk, but sometimes nods his head yes or no.

47.     Nicholson continued to ask A.V. if he would come talk in the SRO office.  A.V. stared blankly and occasionally shook his head no in response.

48.     At this point, neither Principal D'Ardenne nor Dr. Smrcka attempted to preserve the status quo: A.V. was de-escalating and sitting calmly and quietly.  Neither Principal D'Ardenne nor Dr. Smrcka asked the SROs for time to continue the de-escalation; neither asked to communicate with A.V. without the officers hovering over him; neither told the SROs that A.V. needed to sit for a while before he could come to the office with them; and neither told the SROs that they or another school employee or A.V.'s parents would bring A.V. to the SRO office when he was ready.

49.     Instead, Dr. Smrcka turned to A.V., as SRO Nicholson and Peterson were hovering over A.V., and said: "if you're . . . like [sic] refusing to cooperate with [the SRO], [the

SRO] is not going to be left with any choice but to . . . like [sic] . . . take you there whether you like it or not."

50.     In saying this, Dr. Smrcka allowed—and even encouraged—the SROs to forcibly take and handcuff A.V. even though Sagewood Middle School's Code of Conduct, Colorado state law, and Colorado Department of Education regulations prohibit the use of restraints as a form of discipline or way to gain control of a student, and only allow the use of restraints in emergencies *and* after less restrictive alternatives have either failed or have been deemed inappropriate or ineffective.  C.R.S. § 26-20-103; C.R.S. § 26-20-111; Colo. Code Regs. § 2620-R-1.00-2.01 (2017).  Dr. Smrcka ignored the Code and these laws, and encouraged the SROs to step in to use a restraint as a form of discipline or control, despite that there was no emergency, A.V. was calm, and A.V. was successfully de-escalating.

51.     Then, despite the fact that A.V. was sitting quietly and that there was no emergency requiring immediate intervention, SRO Nicholson and Peterson abruptly approached A.V. in a threatening manner and aggressively handcuffed him.  SRO Nicholson said: "Alright, well, I've asked you, now I'm telling you" as the SROs entered A.V.'s space suddenly and grabbed him.

52.     Nicholson did not adhere to his original suggestion that he would ask A.V. to come with him to the SRO office, and "if he wants to come, that's fine; if he doesn't, that's fine too."  SRO Nicholson and Peterson did not consider any alternatives, such as asking A.V.'s psychologist or classroom aide to bring A.V. to the SROs' office or asking for A.V.'s parents to come to school and bring A.V. to their office.

53.     Demonstrating their lack of training regarding A.V.'s disability, Nicholson and Peterson approached A.V. in a threatening manner that would surely cause A.V. to become re-escalated.

54.     In order to get A.V. in handcuffs, Nicholson took hold of A.V.'s right arm and Peterson took A.V.'s left arm above the elbow.   A.V. tried to lean back and pull away, and cried: "Stop, you're hurting me!"  A.V. screamed "ow" and cried.  A.V. kicked the bottom of a table and wiggled his arms around, asking for them to stop.

55.     As Nicholson and Peterson continued to try to handcuff him, A.V. banged his head against the concrete wall of the school.

56.     A.V. also yelled "Stop!" and "Ow!"

57.     SRO Nicholson grabbed A.V.'s head at the nape of his neck and held it tightly. A.V. yelled: "Ow!  You're choking me!  Ow!"

58.     Once Nicholson and Peterson got A.V. in handcuffs, they paraded the handcuffed eleven-year-old through the hallways of the school, as A.V. pushed back against them, crying.

59.     The SROs erroneously interpreted A.V.'s reactions as "resisting" and being "violent."  When SRO Peterson told A.V. that he needed to stop resisting, A.V. said: "I'm not!"

60.     The SROs pushed the handcuffed boy out of the building toward the patrol car.

61.     A.V. asked officers to remove the handcuffs.  Peterson responded: "We're not taking them off." A.V. continued to cry as the officers pushed him into their patrol car.

62.     Once he was seated in the patrol car, A.V. began banging his head loudly against the plexiglass.

**SROs Leave A.V. In the Patrol Car For Hours**

63. Once A.V. was handcuffed in the backseat of the car, SRO Nicholson left the car, while SRO Peterson stayed with A.V. in the patrol car.

64. Nicholson spoke with Principal D'Ardenne.  Nicholson said to Principal D'Ardenne:  "I was hoping that would go a little easier."  Principal D'Ardenne replied, "Yeah me too. Well, initially . . . he was in a pretty calm place so I was bummed it went that way."

65. Principal D'Ardenne also told Nicholson that A.V. had a history of harming himself.  The principal stated: "[H]e's a kid who's got an emotional disability, which is obviously why he's responding the way he is.  And he's got this history of self-harm . . .  I just want to make sure we're doing everything we can to make sure he's not in any position to harm himself 'cause I think he will try."

66. At this point, A.V. was banging his head repeatedly on the plexiglass and window of the patrol car.  Both SROs Peterson and Nicholson saw and heard A.V. banging his head forcefully while sitting handcuffed in the patrol car.

67. Yet, rather than move A.V. so that he would not bang his head, Nicholson and Peterson left A.V. banging his head in the car and ignored the principal's warning about A.V. inflicting self-harm in the past.

68. Nicholson went to collect witness statements, while Peterson stayed near the patrol car by A.V.  A.V. sat handcuffed in the police car for more than two hours.

69. A.V. calmed down significantly after about 25 minutes in the car.

70. Yet, none of the Defendant SROs removed A.V.'s handcuffs while he sat in the car.

71.     SRO Daniel Coyle—an SRO assigned to another school—arrived at Sagewood at some point while A.V. was still sitting handcuffed in the patrol car.  Like Nicholson and Peterson, Coyle did not uncuff A.V. or do anything to stop A.V. from banging his head.

72.     Principal D'Ardenne, Dr. Smrcka, and other school personnel saw the handcuffing, saw A.V. placed in the police car in handcuffs, and they stood outside of the police car watching as A.V. banged his head.  Nevertheless, Principal D'Ardenne, Dr. Smrcka, and other school personnel failed to monitor A.V. to ensure that he was not injured.  They also did not ask for the handcuffs to be removed at any point during the many hours that A.V. sat handcuffed.  This conflicts with Sagewood Middle School's Code of Conduct, Colorado state law, and Colorado Department of Education regulations requiring school personnel to monitor restrained students, *see* Colo. Code Regs. § 2620-R-2.02(a)(vi); C.R.S. 26-20-104(1)(a); ensure restrained students are safe and not harmed, *see* Colo. Code Regs. § 2620-R- 2.01(3)(b); Sagewood Code of Conduct; ensure relief periods when restraints are removed so the restrained person can move their limbs and use the toilet, *see* C.R.S. 26-20-104(2); and remove restraints as soon as an emergency no longer exists.  *See* Colo. Code Regs. § 2620-R-2.02(1)(a)(iv-v); C.R.S. § 26-20-103; Sagewood Code of Conduct.

### A.V.'s Stepfather Comes to School

73.     While A.V. was sitting handcuffed in the car, A.V.'s stepfather arrived at the school.

74.     A.V.'s stepfather asked to see A.V., but SROs would not allow him to.

75.     Principal D'Ardenne was present when A.V.'s stepfather came to the school.  But he did not bring A.V.'s stepfather to see A.V. in the patrol car (which had been moved behind the school).

76.     Nicholson told A.V.'s stepfather that A.V. would be taken to a juvenile detention center, the Marvin W. Foote Youth Services Center.  He told A.V.'s stepfather that A.V. was being charged with assault for allegedly stabbing a student with a pencil and assaulting a police officer.  He also said that A.V. could be charged with harassing the principal and another teacher, but that the school staff did not want to press charges.

77.     A.V.'s stepfather replied: "I mean this is crazy. This is a kid with autism and you guys are gonna press charges against him?"  A.V.'s stepfather explained that "[t]his is a kid with autism that's obviously dysregulated."

78.     A.V.'s stepfather requested that A.V. be taken to Children's Hospital because he had become dysregulated.

79.     Despite A.V.'s stepfather's requests to see A.V. and for the officers to take A.V. to Children's Hospital, the SROs did not change course or get A.V. medical attention.

80.     No school personnel obtained medical attention for A.V., nor did any school personnel tell the SROs that they must obtain medical attention for A.V.

### Transporting A.V. to the Juvenile Detention Center

81.     After leaving A.V. handcuffed in the car for over two hours without a parent, without an opportunity to use the restroom and without food, SROs patted A.V. down and moved him into a different police car.  A.V. complied.

82.     SRO Coyle drove A.V. to the Foote Center.

83.     Coyle left A.V. in handcuffs throughout the ride, even though A.V. significantly calmed down.

84.     Although the SROs knew A.V. had been repeatedly and forcefully banging his head against the plexiglass and that he was dysregulated, none of them got A.V. any medical attention.

85.     Nobody at the Foote Center evaluated A.V.'s medical condition.

86.     The SROs and school personnel discriminated against A.V. because of his disabilities when they determined not to get him medical attention.

87.     The eleven-year-old remained in custody at the Foote Center into the night, until his parents were able to post a $25,000 bond to release him.

88.     A.V. was charged with misdemeanor assault for allegedly causing injury to his classmate, two charges of misdemeanor harassment for allegedly striking school staff, as well as second degree felony assault of a peace officer and a misdemeanor of resisting arrest.  The charges have since been dropped.

**Aftermath**

89.     A.V. sustained serious injuries as a direct result of the events described above as evidenced by the following:

  a.     Due to the handcuffs, A.V. had become extremely dysregulated and banged his head repeatedly during the arrest and in the patrol car.  A.V. sustained a head injury with a 5 centimeter hematoma on his forehead as a result.

  b.      A.V. also had swollen wrists from the handcuffs.

  c.     The night of the incident, A.V. would not eat or speak.  For at least a week after, A.V. was extremely dysregulated: he barely spoke to anyone, even his parents; he was lethargic and he was very irritable.

d.   As a result of the incident, A.V. was admitted into the Day Treatment program at Children's Hospital for 9 days, from September 6 through September 18, 2019.  A.V.'s parents asked the program to admit A.V. as soon as the program had an opening because of the traumatic impact of the incident.  At the program, A.V. was provided coordinated medical and behavioral treatment from doctors and therapists.

e.   Numerous doctors and therapists diagnosed A.V. after the incident with depression, an anxiety disorder, and selective mutism – a severe disorder where a person is unable to speak in certain social situations.

f.   One doctor from Children's Hospital, who diagnosed A.V. with depression, anxiety, and selective mutism, noted that A.V. was sad, excessively worried, socially withdrawn and socially avoidant.

g.   A.V. also suffers from Post Traumatic Stress Disorder ("PTSD") as a result of the SROs' actions and receives targeted trauma therapy to address this disorder.

h.   Before the incident, A.V. enjoyed going to school and never had any attendance problems.  But after the incident, A.V. became extremely fearful of going to and being in school.  Still to this day, two and a half years later, A.V. often refuses to get out of bed to attend school and if he does get out of bed and get ready for school, he often cries and refuses to get out of the car to enter school when he arrives.

i.   After the incident, the School District placed A.V. in a specialized private school where he receives trauma therapy from a licensed trauma

therapist.  Despite this targeted trauma therapy and specialized school, A.V. is unable to attend school on a consistent or regular basis due to anxiety and fears related to the incident – sometimes attending school for only three days out of a month.

j.      Since the incident occurred in 2019 and still to this day, A.V. becomes visibly upset and anxious – his whole body shaking in terror – when he sees police officers in uniform.

k.      Since the incident occurred in 2019 and still to this day, A.V.'s behaviors escalate significantly around strangers whom he perceives are a threat and who get too close to him.

l.      Since the incident occurred in 2019 and still to this day, A.V. is less trustworthy of adults in general than he was before and is more fearful around even familiar adults.

m.      After A.V. suffered the trauma from the incident and/or due to his head-banging, he has experienced problems remembering events.   He never had a problem remembering events before the incident.

**The Sheriff and School District Are Responsible for the Actions of the Defendant SROs**

90.      Both the Douglas County School District and the Douglas County Sheriff were responsible for the actions of the Defendant SROs.

91.      DCSO is responsible the actions of Defendant SROs because the Defendant SROs are DCSO employees.  DCSO pays costs for the SRO's salaries, benefits, and training.  The SROs were also agents of the Sheriff's Office.

92.      The School District is responsible for the actions of Defendant SROs because:

a.   Since 1988, the School District has partnered with the Douglas County Sheriff's Office to place SROs in schools and maintain an SRO program;

b.   Before the 2019-2020 school year, the School District board voted 6-0 to renew its contract for SROs and to share costs with DCSO for SROs, as it had for the past 31 years;

c.   In 2019-2020, the School District paid 50% of SRO salaries and benefits, and over 60% of SRO training costs;

d.   In 2019-2020, the School District paid $898,453 for the SRO program, which included payments for SROs' salaries, fringe benefits, uniform allowance, smartphone service, program costs, software subscriptions and training.  Additionally, the School District provided up to 90 hours of off-duty pay for SROs to attend school-related events after school hours.

e.   Before the 2019-2020 school year, the School District added 5 additional full time SROs and placed them in middle schools for the first time;

f.   The School District contracted for a total of at least 13 SROs for the 2019-2020 school year;

g.   The School District entered a revocable contract to place SROs into its schools;

h.   The SROs are assigned to specific schools within the School District;

i.   The School District invites SROs to work in its schools and the SROs' full-time job and entire role is to work for and in a school;

j.   The main purpose of the SRO Program is to benefit the School District;

k.   SROs are contractors and agents of the School District;

l.    The School District's policies require the superintendent to develop procedures for the employment, training, and use of SROs, and procedures for communication between district officials and law enforcement;

m.    The School District's policies state that "each [school] building principal shall be responsible for the supervision and implementation of the safe school program at his or her school," which includes the SRO program;

n.    The SROs are answerable to the principal of each school;

o.    The SROs take law enforcement action based on requests from school principal and school personnel;

p.    The SROs work closely with school administrators and faculty to determine the most effective use of their time and expertise;

q.    The Sheriff's Office and school administrators meet to discuss duties of SROs;

r.    The SROs' duties include providing education and counseling to students on law enforcement issues, acting as liaisons between the Sheriff and School District, coordinating matters of mutual law enforcement concerns between the School District and Sheriff, and investigating law enforcement and public safety issues on school campuses;

s.    The SRO is required to educate students and to establish rapport with students and be law-related counselor to students;

t.    The SRO is responsible for developing an effective working relationship with school support staff;

u.   Upon information and belief, the School District is responsible for recruiting, interviewing, and evaluating SRO applicants, and for recommending SROs for hire;

v.   Upon information and belief, the School District has decision-making authority to terminate SROs, ask for an SRO to be removed from the school, and/or revoke permission of an SRO to work at a school;

w.   The School District has authority to terminate the contract for SROs;

x.   The School District has authority to minimize or remove budgeting and appropriation of funds for the SRO program;

y.   Upon information and belief, the School District is required to participate in the reviews and work performance evaluations of SROs and is required to regularly advise DCSO of the SROs' work performance, and must immediately report any instances of alleged misconduct or discrimination by an SRO;

z.   Upon information and belief, SROs have access to Douglas County School District confidential information about students;

aa.   SROs are required to know School District policies, regulations, and guidelines related to student conduct, discipline issues, and safety;

bb.   The schools within the Douglas County School District consider SROs to be part of the school personnel team and represent that SROs are part of the security team in school newsletters and other representations to parents;

cc.  The SROs' email addresses and phone numbers are School District email addresses and phone numbers;

dd.  The School District provides and maintains (at the School District expense) an office to each SRO in each school;

ee.  The School District provides and maintains (at the School District expense) a telephone and computer to each SRO in each school along with office furniture;

ff.  The School District provides and maintains (at the School District expense) a rifle locker for SROs in each school.

**The Sheriff and School District Failed to Adequately Train the SROs on Interacting with Students with Disabilities**

93.  For the same reasons that Douglas County School District and the Douglas County Sheriff were responsible for the actions of the Defendant SROs, both entities were also responsible for effectively training the Defendant SROs, but both failed to do so.

94.  The Sheriff's policies state that all officers are trained in recognizing mental health and related disorders, including autism, and trained in de-escalation techniques. But in reality, SROs receive little or no training from the Sheriff's Office or School District on interacting with students with disabilities, how to approach such students, how to de-escalate such students, how to keep these students safe, or when to seek medical attention for such students.

95.  Whatever training they do receive is ineffective and inadequate, and leaves officers with clear gaps in their knowledge of how to interact with students with disabilities.

96.  Additionally, the 2019-2020 school year was the first year that SROs were assigned specifically to Douglas County middle schools, and despite this, neither the School

District nor the DCSO provided training to SROs in interacting with middle-school aged children with disabilities.

97.     The SROs involved in this incident did not have appropriate training.

98.     Nicholson had never been an SRO before the 2019-2020 school year.  DCSO and the School District did not assign experienced SROs to middle schools, but instead, at least at Sagewood Middle School, they placed a new SRO: SRO Nicholson.

99.     SRO Nicholson was still in his field training when he handcuffed and arrested A.V.

100.     Despite his own limited and outdated training and lack of experience with middle-school aged students, SRO Peterson was chosen to supervise and observe SRO Nicholson in the field to train him to be an SRO at Sagewood Middle School.  SRO Peterson was thus supervising SRO Nicholson on August 29, 2019 at the time of the incident.

101.     SRO Peterson commended SRO Nicholson's actions after the incident with A.V. and commented that Nicholson did a "great" and "outstanding job" handling the "highly stressful call."

102.     Peterson commented that Nicholson was "prepared to handle his new role as the Sagewood SRO . . . and he has the knowledge and skill set to be a [sic] great SRO."

103.     On September 4, 2019, just four school days after the incident with A.V., Nicholson was recommended to advance out of SRO training to solo status, because he was deemed to have successfully completed the SRO field training program.

104.     Nicholson advanced out of field training even though he clearly violated numerous Sheriff's Office policies in mishandling the situation with A.V, not to mention the numerous violations of A.V.'s rights.

105.     SROs Nicholson, Peterson, and Coyle violated the following DCSO policies in the situation with A.V.:

a.     Policies that require officers to use discretion and the least coercive intervention and to consider alternatives to arrest when dealing with juveniles and people with mental health disorders and disabilities;

b.     Policies that require juveniles who are placed in custody to be transported "without delay" to the juvenile assessment center; and

c.     Policies on detainee transportation that require that officers transport detainees who become "sick or injured incidental to an arrest" to an appropriate medical facility as soon as possible or otherwise request paramedics.

106.     The SROs violated these policies because: (1) they did not consider alternatives to incarceration throughout the incident; (2) they left A.V. handcuffed in the patrol car for over two hours rather than transporting him immediately; and (3) they did not take A.V. to get medical attention despite knowing that A.V. was banging his head and was dysregulated, and that his father said he needed to be taken to the Children's Hospital.

107.     No SRO was disciplined due to the incident.

108.     In fact, the SROs were rewarded for their performance or complimented each other on their performance.

**The School District Failed to Implement Adequate Policies and Adequately Train School Personnel on Interacting with Students with Disabilities**

109.     The School District failed to implement adequate policies and adequately train school personnel—including Principal D'Ardenne and Dr. Smrcka—on interacting with students with disabilities.

110.     Colorado law requires school districts to adopt conduct and discipline codes that "include plans for the appropriate use of prevention, intervention, restorative justice, peer mediation, counseling, or other approaches to address student misconduct, which approaches are designed to minimize student exposure to the criminal and juvenile justice system." C.R.S. § 22-32-109.1(2)(a)(II)(A-B). Nevertheless, the School District failed to implement adequate policies and/or failed to train school personnel in ways that would ensure that students with disabilities, like A.V., were given accommodations rather than referred to law enforcement.

111.     The School District (and also the Sheriff) failed to have policies or memorandums of understanding in place that detailed and adequately explained when SROs can become involved in student discipline and procedures that SROs must follow when using restraints in schools.

112.     Additionally, despite relevant provisions in Sagewood's Code of Conduct and relevant state law and regulations discussed in paragraphs 50 and 72 above, school staff at Sagewood Middle School – including Principal D'Ardenne and Dr. Smrcka – did not receive adequate training on the Code of Conduct or these laws and regulations.

113.     School staff, including Principal D'Ardenne and Dr. Smrcka, also lacked training on the following:

   a.     What to do when a student with a disability has a disability-related behavioral incident in school and how to de-escalate students with disabilities (including students with autism specifically);

   b.     Accommodations and less restrictive alternatives that can be provided to students with disabilities (and specifically students with autism who are escalated);

c.   Recognizing when less restrictive alternatives fail, are ineffective or are inefficient or when additional or continued accommodations need to be provided;

d.   Recognizing what type of disability-related behavior is an emergency;

e.   Forms of discipline or ways to gain control or compliance of students other than calling police or referring students to law enforcement;

f.   Accommodations that need to be provided to students with disabilities prior to calling in SROs to handle a behavioral issue in school;

g.   How to avoid police becoming involved unnecessarily, how to avoid police using restraints when less restrictive alternatives have not failed, and how and when to intervene when police are not providing accommodations;

h.   How to keep students safe when restrained, when and how to check on and monitor students who are restrained, when restraints should be removed, how to provide relief periods, and when to seek medical attention for such students.

114.   Whatever policies that are in place and training that school personnel receive are ineffective and inadequate, and leave school officials with clear gaps in their knowledge.

115.   Additionally, the 2019-2020 school year was the first year that SROs were assigned specifically to Douglas County middle schools, and despite this, the School District did not provide training or adequate policies to school staff on when it is appropriate to call on SROs to handle school incidents involving middle-school aged children with disabilities and when accommodations should instead be fully provided.

**The Sheriff's Office and School District Have a Pattern and Practice of Mishandling Situations Involving Students with Disabilities**

116.    The Douglas County School District and Sheriff's Office have a pattern and practice of their employees and agents mishandling situations involving students with disabilities.

117.    They have a pattern and practice of disproportionately putting children with disabilities into restraints, secluding them, and referring them to law enforcement.

118.    In the 2018-2019 school year, the Douglas County School District used the highest number of restraints and seclusions on students out of any school district in Colorado, with 352 total restraints and 79 total seclusions.[3]

119.    According to the School District's own "Restraint Reports" from 2016-2019, 71.9% of the time when interventions such as restraints were used, they were used on children who had "center-based" learning needs and/or moderate needs.

120.    Additionally, according to a Colorado Department of Education report, during the 2018-2019 school year, 29.6% of students in the Douglas County School District who were referred to law enforcement were special education students.[4]

121.    Furthermore, several other incidents in Douglas County schools reflect the pattern and practice in which the School District and Sheriff's Office—and/or their agents— inappropriately handle children with disabilities and inappropriately ensnare them in the criminal justice system.

---

[3] Melanie Asmar, *Behind Closed Doors: When it Comes to Seclusion and Restraint, Colorado Schools 'are Investigating Themselves,'* CHALKBEAT, Feb. 20, 2020, https://co.chalkbeat.org/2020/2/20/21178602/behind-closed-doors-when-it-comes-to-seclusion-and-restraint-colorado-schools-are-investigating-them
[4] This study also showed that 13 out of the 27 students in Defendant School Dsitrict who were referred to law enforcement in the 2018-2019 school year were Hispanic (48%), even though only about 15% of students in the district are Hispanic.

122.    For example, in October 2015, a few years prior to this incident, a ten-year-old child with autism at a Douglas County school got into a schoolyard altercation, and as in this case, there, the child was criminally charged with assault and harassment.[5]  There were two protests at the courthouse in response to these criminal charges, in which parents and autism advocates suggested that children with autism in Douglas County schools were criminalized for their autism.[6]  Charges against the child were dismissed over two years after the incident occurred.[7]

123.    The pattern continued with another incident in December 2019 at Sagewood Middle School—the same school that A.V. attended.  During that incident, a teacher claimed that a 12-year-old child with autism and other disabilities spit on her when he was escalated.  In response, SRO Nicholson—the same SRO who had handcuffed A.V.—aggressively handcuffed the child and left the child in handcuffs for three hours.  The child was criminally charged.  The child had bruises and marks on his wrists for several days.  He had persistent nightmares and could hardly sleep afterwards, and he is now terrified of police.

124.    Another similar incident occurred in October 2020, when an eight year-old child with autism in a Douglas County school got upset that he was unable to go to a Halloween party.  His teacher called in an SRO, who, along with other officers, pinned the child down for approximately an hour.  The child had severe meltdowns after this experience, lost years of progress he had made, and developed a sleep-panic disorder.

---

[5] Grant Stringer, *After Schoolyard Altercation, Child with Autism Charged with Assault,* WESTWORD, July 17, 2017, https://www.westword.com/news/autistic-child-logan-thompson-charged-with-assault-in-douglas-county-9266351.
[6] *Id.*
[7] *Id.*

125.    The Defendant SROs, Principal D'Ardenne, and Dr. Smrcka took the actions they did with A.V. on August 29, 2019 pursuant to the patterns and practices in Douglas County described above.

**The Sheriff and School District Knew of the Risk that SROs and School Staff Would Violate the Rights of Children with Disabilities with their Present Training and Policies, and their Failure to Implement Adequate Policies and Provide Adequate Training Was A Moving Force Behind the Injuries Here**

126.    The School District and Sheriff were aware or should have been aware, based on their own statistical data and specific incidents, that their present training and policies for school staff—including SROs—posed a risk that students' rights would be violated, and that further training and policies regarding interacting with students with disabilities were needed to prevent or reduce that risk.

127.    Indeed, the Douglas County School District had also entered into multiple Resolution Agreements with the U.S. Department of Education Office for Civil Rights ("OCR") after incidents involving its mishandling of students with disabilities, including but not limited to: (1) a 2016 agreement in which the School District promised to provide training to all School personnel at a particular Douglas County school regarding disability discrimination; (2) a 2018 agreement in which the School District promised to train staff and administrators at a particular Douglas County school on providing a least restrictive environment to students with disabilities; and (3) an agreement entered into in July 2019 in which the School District promised to train staff and administrators at a particular Douglas County School on disability discrimination.

128.    Each of these Resolution Agreements showed that the School District and the Sheriff were aware that their present training posed a risk that students' rights would be violated, and that further training was needed for SROs and school staff across the District, and not just in the schools subject to the Resolution Agreements, to prevent or reduce that risk.

129.     In addition, national and local news coverage of SRO interactions with children with disabilities made or should have made the School District and Sheriff aware of the risks that students' rights would be violated if they did not provide further training and adequate policies on handling students with disabilities.

130.     In July 2018, multiple national news stories were published about a mother suing the city of Flint, Michigan after an SRO handcuffed her seven-year-old son for about an hour during an afterschool program.[8]

131.     Similarly, on August 13, 2018, about a year before the incident with A.V., ABC news published online and televised national stories about a ten-year-old boy with autism who was handcuffed by an SRO in Denton, Texas.[9]

132.     Prior to that, in October 2015, national news organizations published a widely-circulated video of an SRO violently throwing a South Carolina high school student and her desk to the ground and dragging her along the ground.[10]  News stories continued to be published as the SRO was fired and state and federal investigations were launched.[11]

133.     Moreover, local news stories, that were closer in time and location to Douglas County, should have made Defendant Sheriff and School District aware of these issues.

---

[8] Associated Press, *Lawsuit: 7-year-old Boy Handcuffed By Officer in School,* Fox News, Jul. 31, 2018, https://www.foxnews.com/us/lawsuit-7-year-old-boy-handcuffed-by-officer-in-school.
[9] Joeeta Biswas, *Parents to Sue After 10-Year-Old Boy With Autism Repeatedly Pinned To The Ground, Handcuffed By Officer,* ABC News, Aug. 13, 2018, https://abcnews.go.com/News/parents-sue-10-year-boy-autism-repeatedly-pinned/story?id=57144546
[10] Dana Ford, Greg Botelho & Kevin Conlon, *Spring Valley High School Officer Suspended After Violent Classroom Arrest*, CNN (Oct. 27, 2015, 10:12 PM), http://edition.cnn.com/2015/10/27/us/south-carolina-school-arrest-video//
[11] Craig Melvin & Erik Ortiz, *South Carolina Deputy Ben Fields Fired After Body Slamming Student: Sheriff*, NBC News (Oct. 28, 2015, 12:34 PM), http://www.nbcnews.com/news/us-news/sheriff-announce-south-carolina-deputy-ben-fields-be-fired-sources-n452881.

134.     In April 2019, just four months prior to the incident involving A.V., Channel 9 News published and televised several news stories detailing the handcuffing of a seven-year-old at a public elementary school in Denver.[12]

135.     One month later, news sources reported on another handcuffing of a child in a Denver public school: this time an eleven-year-old with disabilities.[13]

136.     News channels widely reported that the Board of Education in Denver changed its policies as a result of these two instances so that SROs could no longer handcuff elementary school students unless the student was openly displaying a deadly weapon, and SROs were discouraged from handcuffing middle school and high school students.[14]

137.     National studies and statistics also made or should have made the Defendant School District and Sheriff aware of the risks that students' rights would be violated if they did not provide further training and better policies on handling students with disabilities.

138.     A recent analysis of 2011-12 data by the U.S. Department of Education Office for Civil Rights revealed that although students with disabilities account for only 12% of public school students, they comprise 75% of students subjected to physical restraint in schools.[15]

139.     In 2009, the U.S. Government Accountability Office ("GAO") published the results of a nationwide study documenting hundreds of uses of restraints in schools between

---

[12] 9 News, *Father Speaks Out About 7-Year-Old Son Being Handcuffed by Denver Public School Safety Employees*, May 1, 2019, https://www.9news.com/video/news/investigations/father-speaks-out-about-7-year-old-son-being-handcuffed-by-denver-public-school-safety-employees/73-1b4a350b-13db-4d31-b3f5-ebf4e2aedfdd?jwsource=cl.

[13] Melanie Asmar, *Hancuffed in Denver in the Fifth Grade: 'Whenever I Shut My Eyes, I Saw the Cuffs,'* CHALKBEAT, May 30, 2019, https://chalkbeat.org/posts/co/2019/05/30/handcuffed-in-denver-in-the-fifth-grade-whenever-i-shut-my-eyes-i-saw-the-cuffs/ (May 30, 2019).

[14] Melanie Asmar, *Denver School Board Bans Use of Handcuffs on Elementary School Students*, DENVER POST, June 14, 2019, https://www.denverpost.com/2019/06/14/denver-school-board-bans-use-of-handcuffs-on-elementary-school-students/ (June 14, 2019).

[15] U.S. DEP'T OF EDUCATION OFFICE FOR CIVIL RIGHTS, ISSUE BRIEF NO. 1: SCHOOL DISCIPLINE, RESTRAINT & SECLUSION HIGHLIGHTS 9 (Mar. 2014).

1990 and 2009, including 20 restraints that resulted in the death of a child.[16]  Nearly all of the incidents investigated by the GAO involved children with disabilities.

140.    That same year, in testimony before the U.S. House of Representatives Education and Labor Committee, the GAO presented these findings and reported on the risks of injury and death associated with the restraint of children.  The GAO explained that even in situations where a child does not sustain any physical injury as a result of restraint, he is often severely traumatized.[17]

141.    In 2016, the United State Department of Education Office for Civil Rights stated that "[s]chools cannot divest themselves of responsibility for the nondiscriminatory administration of school policies, including restraint, by relying on school resource officers." Office for Civil Rights, Dear Colleague Letter: Restraint and Seclusion of Students with Disabilities, at 15 (Dec. 28, 2016, updated Jan. 10, 2017) (citing 34 C.F.R. § 104.4(b)).

142.    In January 2019, the U.S. Department of Education announced an initiative on the inappropriate use of restraint and seclusion, and in July 2019, its agencies provided a presentation to educational agencies about how the use of restraint and seclusion may result in unlawful discrimination against students with disabilities and on steps public schools must and can take to prevent the inappropriate use of restraint and seclusion on children with disabilities.[18]

143.    These national studies and presentations should have informed the School District and Sheriff that further training and better policies were necessary regarding putting children

---

[16] Statement of Gregory D. Kutz, Managing Director of Forensic Audits and Special Investigations, U.S. Government Accountability Office, to Committee on Education and Labor, U.S. House of Representatives 8 (May 2009), at http://www.gao.gov/new.items/d09719t.pdf.
[17] *Id.* at 1.
[18] U.S. Department of Education Office of Civil Rights, *Civil Rights Data Collection (CRDC): Technical Assistance on Restraint and Seclusion,* https://www2.ed.gov/about/offices/list/ocr/data.html?src=image.

with disabilities in restraints and the risk of not providing this further training or adequate policies.

144.     Despite their knowledge of the need for more effective training and better policies, and despite their knowledge of the risks of failing to meet that need, the Sheriff and School District failed to provide effective additional training and policies to SROs and school staff on interacting with students with disabilities and providing accommodations.

145.     The School District and Sheriff's pattern and practice, and their lack of adequate and effective training and policies for SROs and school staff, were the moving forces behind the injuries to A.V. and the violations of his rights.

## FIRST CLAIM FOR RELIEF
**(Violations of the Americans with Disabilities Act- 42 U.S.C. § 12131)**
*Against Defendant Tony Spurlock in his official capacity and Defendant Douglas County School District*

146.     Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

147.     Title II of the ADA prohibits public entities from discrimination on the basis of a disability.  42 U.S.C. § 12131(1)(B)).

148.     A.V. is a qualified individual with a disability under the ADA.  He has autism and serious emotional disabilities, which substantially limit his major life activities by causing him to be triggered by touch, and causing him challenges in his ability to communicate and manage emotions.

149.     Through the SROs, Defendant Sheriff and School District denied A.V. reasonable accommodations.

150.     Because the SROs denied A.V. reasonable accommodations, the Sheriff and School District caused A.V. to suffer greater injury and indignity than other arrestees.

151. The SROs knew that accommodations were necessary under Douglas County Sheriff's Office policies, but were indifferent to an obvious risk of not providing the accommodations.

152. Under Title II and Section 504, an entity is liable for acts of its employees and agents. *See A.K.B. v. Indep. Sch. Dist. 194*, No. 19-cv-2421-SRN-KMM, 2020 U.S. Dist. LEXIS 52688, at *25 (D. Minn. Mar. 26, 2020) (collecting cases); *Doe v. Bd. of Cnty. Comm'rs*, No. 11-cv-0298-CVE-PJC, 2011 U.S. Dist. LEXIS 147673, at *6-10 (N.D. Okla. Dec. 22, 2011). Under Title II and Section 504, an entity is also liable for disability discrimination whether committed directly or "through contractual, licensing, or other arrangements." *See Marks v. Colo. Dep't of Corr.*, 976 F.3d 1087, 1096-97 (10th Cir. 2020) (citing 42 U.S.C. § 12182(b)(1)(A); 28 C.F.R. § 35.130(b); and 28 C.F.R. § 42.503(b)). School districts are liable for disability discrimination under these statutes for the acts of "school officials, school employees, and everyone over whom a school exercises some control, whether through contract or other arrangement, including SROs, whether they are school district employees or work for a non-district law enforcement agency." Office for Civil Rights, Dear Colleague Letter: Restraint and Seclusion of Students with Disabilities, at 15 (Dec. 28, 2016, updated Jan. 10, 2017) (citing 34 C.F.R. § 104.4(b) (the nondiscrimination requirements of Section 504 extend to conduct undertaken by entities that carry out some or all of the schools' functions through contractual or other arrangements)). Here, the Sheriff is liable because it employs the SROs and SROs are agents of the Sheriff. The School District is liable because it contracted to place SROs in its schools and the SRO program is a program of the School District. The Sheriff and School District are both also liable for the actions of the SROs for the reasons stated in paragraphs 90-92.

153.    The School District also denied A.V. reasonable accommodations through the actions of Principal D'Ardenne, Dr. Smrcka, and other school staff.

154.    Because Principal D'Ardenne, Dr. Smrcka, and other school staff denied A.V. reasonable accommodations, the School District caused A.V. to suffer greater injury and indignity than other students.

155.    Principal D'Ardenne, Dr. Smrcka, and other school staff knew that accommodations were necessary because they knew of the accommodations that A.V. needed, it was obvious, and they knew about their duties under Sagewood's Code of Conduct and state law and regulations.  But, they were indifferent to an obvious risk of not providing accommodations.

156.    As the employer, the School District is liable for the actions of Principal D'Ardenne and Dr. Smrcka, as well as other school staff.

157.    The Sheriff and School District also denied A.V. the benefit of properly trained SROs, who would be trained to appropriately interact with students with disabilities and reasonably accommodate those students.

158.    Additionally, the School District denied A.V. the benefit of a properly trained school staff, including a properly trained principal and school psychologist, who would be trained to appropriately interact with students with disabilities and reasonably accommodate those students.

159.    The Sheriff and School District were on notice of the need for more or different training, but were deliberately indifferent to that need.

160.    As a proximate result of Defendant Sheriff's and School District's actions and inactions, A.V. suffered physically and emotionally, and continues to experience trauma, fear, distrust, depression, and anxiety as described in more detail in paragraph 89 above.

161.     As a result of the Sheriff's and School District's violations of Title II of the ADA, A.V. is entitled to compensatory damages, and reasonable attorneys' fees and costs.

## SECOND CLAIM FOR RELIEF
### (Violations of the Rehabilitation Act- 29 U.S.C. § 794)
*Against Defendant Tony Spurlock in his official capacity and Defendant Douglas County School District*

162.     Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

163.     Section 504 of the RA forbids programs that receive federal financial assistance to discriminate against individuals with a disability solely because of their disability.  29 U.S.C. § 794(a).

164.     The Sheriff's Office and School District receive federal financial assistance.

165.     The substantive standards of Title II claims and § 504 claims are the same.  Thus, for the same reasons as discussed in paragraphs 148-156, the Sheriff and the School District violated the RA.

166.     The SROs discriminated against A.V. solely as a result of his disability.

167.     Principal D'Ardenne, Dr. Smrcka, and other school staff discriminated against A.V. solely as a result of his disability.

168.     As a proximate result of Defendant Sheriff's and School District's actions and inactions, A.V. suffered physically and emotionally, and continues to experience trauma, fear, distrust, depression and anxiety as described in more detail in paragraph 89 above.

169.     As a result of the Sheriff's and School District's violations of Section 504 of the Rehabilitation Act, A.V. is entitled to compensatory damages, and reasonable attorneys' fees and costs.

## THIRD CLAIM FOR RELIEF
### (Violations of the Fourth Amendment Pursuant to 42 U.S.C. § 1983)

*Against All Defendants*

170.     Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

171.     The Fourth Amendment forbids unreasonable seizures.  Seizures are unreasonable when they are not justified at their inception, when they are carried out with excessive force, when they are carried out in an unreasonable manner, or when they become unreasonable as a result of their duration or for other reasons in light of the circumstances.

172.     SROs Nicholson, Peterson, and Coyle engaged in an unreasonable seizure by handcuffing A.V. after he was calm, not posing a threat, and not attempting to flee.

173.     SROs Nicholson, Peterson, and Coyle engaged in an unreasonable seizure by handcuffing the child for over two hours.

174.     SROs Nicholson, Peterson, and Coyle used excessive force in seizing A.V. violation of A.V.'s Fourth Amendment rights by handcuffing A.V. unduly aggressively and then forcing him to remain handcuffed and restrained for an excessively lengthy period of time.

175.     SROs Nicholson, Peterson, and Coyle both unreasonably seized A.V. and used excessive force against A.V. in light of the totality of the circumstances, including but not limited to:

                    a.  That A.V. had not engaged in serious criminal activity;

                    b.  That A.V. posed no real physical threat to anyone;

                    c.  That A.V. was not attempting to flee school grounds;

                    d.  A.V.'s age, size, and disabilities;

                    e.  The failure of the SROs to appropriately approach and
                        handle a child of A.V.'s age, size, and with A.V.'s
                        disabilities; and

35

    f. The SROs' aggressive and threatening actions that

      prompted A.V. to re-escalate.

176. A.V.'s right to be free from unreasonable seizure and excessive force as described herein was clearly established at the time SROs Nicholson, Peterson, and Coyle handcuffed him and kept him in handcuffs for hours.

177. The Sheriff's Office and School District, and SROs Nicholson, Peterson, and Coyle, often interact with students with disabilities and thus the circumstances constituted a usual and recurring situation.

178. The School District and Sheriff's Office failed to adequately train and supervise SROs, despite foreseeable consequences of such failure, on appropriately interacting with children with disabilities.  That deliberately indifferent failure to train was a proximate cause of the unreasonable seizure and excessive force which violated A.V.'s Fourth Amendment rights.

179. The School District and Sheriff's Office failed to implement adequate policies, procedures, and customs, despite foreseeable consequences of such failure, on appropriately interacting with children with disabilities, when SROs can become involved in student discipline, and procedures that SROs must follow when restraints are used in schools.  That deliberately indifferent failure to implement policies, procedures, and customs was a proximate cause of the unreasonable seizure and excessive force for which violated A.V.'s Fourth Amendment rights.

180. As a proximate result of all Defendants' actions and inactions, A.V. suffered physically and emotionally, and continues to experience trauma, fear, distrust, depression and anxiety as described in more detail in paragraph 89 above.

181. A.V. is entitled to compensatory damages, punitive damages from the individual defendants, and reasonable attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

      (a)    Compensatory damages from the School District, Sheriff, and SROs sued in their individual capacities;

      (b)    Punitive damages from the SROs sued in their individual capacities;

      (b)    An award of reasonable attorney's fees and costs associated with this action on all claims allowed by law;

      (c)    Pre and post-judgment interest at the lawful rate;

      (d)    Any further relief that this Court deems just and proper in equity and at law.

## JURY DEMAND

Plaintiff requests a trial by jury in this matter.

      Respectfully submitted this 18th day of March, 2022.

      *s/ Arielle Herzberg*
      Mark Silverstein
      Sara R. Neel
      Arielle Herzberg
      Asma Kadri Keeler
      American Civil Liberties Foundation of Colorado
      303 E. 17th Avenue Suite 350
      Denver, Colorado 80203
      Phone: (720) 402-3104
      msilverstein@aclu-co.org
      sneel@aclu-co.org
      aherzberg@aclu-co.org

      Jack D. Robinson
      SPIES, POWERS & ROBINSON, P.C.
      1660 Lincoln Street, Suite 2220
      Denver, Colorado 80264
      Telephone: (303) 830-7090
      robinson@sprlaw.net

      *In cooperation with the ACLU Foundation of Colorado*

ATTORNEYS FOR PLAINTIFF